**UNITED STATES of America**

**v.**

**Elaine MINTZES and Alvin S. Mintzes, d/b/a Castle Realty Company**

**Civ. No. 20698.**

United States District Court
D. Maryland.

Oct. 13, 1969.

Barnet D. Skolnik, Asst. U. S. Atty., Baltimore, Md., Alexander C. Ross and Joanne E. Clifford, Attys., Department of Justice, Washington, D. C., for plaintiff.

Norman P. Ramsey, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

This is said to be the first action brought by the Attorney General under 42 U.S.C.A. § 3613, to enforce the provi-

sions of subsection (e) of § 3604,[1] which provides:

"*§ 3604. Discrimination in the sale or rental of housing.*

"As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

\* \* \* \* \* \*

"(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, or national origin."

Under § 3613 the Attorney General may bring a civil action for an injunction and other appropriate relief whenever he has reasonable cause to believe either "that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter", or "that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance."

The Attorney General is proceeding in this case under the first alternative. His complaint alleges that "the defendants, since January 1, 1969, have for profit induced and attempted to induce the owners of certain dwellings, presently occupied by white persons, on Woodbourne Avenue in Baltimore, Maryland, to sell those dwellings by representations regarding the entry and prospective entry of Negroes into the neighborhood". He further alleges that this conduct of

defendants is in violation of 42 U.S.C.A. § 3604(e), and constitutes "a pattern or practice of resistance to the full enjoyment of rights secured by Title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3601 *et seq.*" [2]

Defendants challenge the credibility of plaintiff's witnesses, and (1) object to the admissibility of the testimony of three witnesses, on the ground that the properties which they owned were either exempted from the operation of § 3604(e) by § 3603(b) (1), or were not within the coverage of the Act, and that any representations made to them are irrelevant and immaterial in this case; (2) contend that a specific intent to violate the statute must be proved; (3) deny that the alleged representations were made "for profit"; (4) challenge the constitutionality of § 3604(e) as written and as sought to be applied in this case; (5) deny that the evidence shows the requisite "pattern or practice"; and (6) argue that the evidence does not justify the relief requested.

*Coverage*

Since the issue of coverage also involves the admissibility of some of the testimony, it should be considered before the findings of fact are made.

Plaintiff offered testimony to prove representations made to Mr. and Mrs. Slater, the owners of a two-family dwelling, and to Mrs. Abel, also the owner of a two-family dwelling, and to Mrs. Abel's son and daughter, who were present when Mrs. Mintzes visited Mrs. Abel. Any prohibited representations made to induce the sale of two-family

---

1. Both of those sections are included in Title VIII, Fair Housing, of the Civil Rights Act of 1968. All section references herein will be to section numbers in 42 U.S.C.A. The last two digits are always the same as in the Act, e. g., § 804 of the Act is § 3604 in 42 U.S.C.A.

2. The government seeks an injunction restraining defendants "from inducing or attempting to induce any person to sell or rent any dwelling by representations regarding the entry or prospective en-

try into the neighborhood of a person or persons of a particular race, color, religion or national origin". The government also asks that the injunction direct defendants to "take such affirmative steps as may be necessary and appropriate to correct the effects of the past unlawful practices described in this complaint" and prays for such additional relief as the interests of justice may require. Those prayers will be discussed at the end of this opinion under the heading "Relief".

dwellings are admittedly covered by the Act.

Plaintiff also offered testimony to prove representations made to Mr. and Mrs. Lincoln, the owners of a single-family dwelling across the street from the other properties. The Lincolns were not offering their property for sale or rent. Defendants contend that the Lincolns' property was exempted from the operation of § 3604(e) by § 3603(b) (1); that the Lincolns therefore do not enjoy with respect to that property the rights arising out of § 3604(e); and that representations which would otherwise be prohibited by § 3604(e), made to induce them to sell that property, do not violate that subsection.

Section 3603(a) provides that after December 31, 1968, § 3604 applies to all dwellings not exempted by subsection (b) of that section. Section 3603(b) provides: "Nothing in section 3604 of this title (other than subsection (c) shall apply to—(1) any single-family house sold or rented by an owner" unless after December 31, 1969, he attempts to sell through a broker or by advertising, subject to other provisos not relevant in this case.

 Section 3604 contains five prohibitions dealing respectively with (a) refusal to deal, (b) discrimination in terms, (c) discriminatory advertising, (d) false representations to any person that a dwelling is not available for sale or rental and (e) the representations, whether true or false, set out in the quotation at the beginning of this opinion. The first four prohibitions in § 3604 apply to actions by the owner of a dwelling who sells or rents it, and are intended to protect others against his actions; the last prohibition, in subsection (e), applies to representations made by others to the owner of a dwelling, and is intended to protect the owner and to prevent the panic selling which is inimical to the purpose of the Act. The question to be decided with respect to the admissibility of the testimony of Mr. and Mrs. Lincoln is whether the provisions of subsection (e) apply to representations made to the owner of a single-family dwelling who does not wish to sell or rent it.

 An owner who does not sell or rent or offer to sell or rent his house, whether it be a single-family dwelling or a multi-family dwelling, does not need an exemption from the prohibitions of § 3604(a)–(d). The exemption provided by § 3604(b) (1) was intended to exempt from the provisions of § 3604 certain owners of single-family dwellings who would be subject to the prohibitions contained in § 3604(a)–(d) were it not for the exemption provided by § 3603(b) (1). Since the owner of a single-family dwelling who does not sell or rent or offer to sell or rent his house is not within the scope or purpose of the exemption created by § 3603(b) (1), that exemption should not be construed to apply to such owners. Although the statute might be clearer, the Court concludes that the draftsman of the Act accomplished this result by making the exemption of § 3603(b) (1) apply to "any single-family house *sold or rented by the owner*", rather than to "any single family house".

This construction is in accord with the general purpose of the Act. Any other construction would weaken the thrust of the Act by perpetuating the right of blockbusters to prey on the fears of the owners of single-family houses *which are not sold or rented or offered for sale or rent.*

The testimony of Mr. and Mrs. Lincoln with respect to representations *made to them is therefore admissible for all purposes of the case.*

 The testimony of Frank Ragonese presents a different problem. Section 3602, Definitions, provides:

"As used in this subchapter—(b) 'Dwelling' means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of

any such building, structure, or portion thereof."

Ragonese owned a vacant lot, formerly improved by a multi-family dwelling, which he had torn down five years ago. He was not offering the lot for sale for any purpose. The government did not prove whether Ragonese was holding the lot for ultimate commercial or residential use. Since the next block to the west is used in part at least for commercial purposes, it is a not unreasonable inference that the land was being held for commercial use. That vacant land, therefore, was not a "dwelling" to which the subchapter applies.

The representations which Ragonese testified were made to him did not violate § 3604(e) and cannot form part of "a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the Act]", as used in § 3613. His testimony is being admitted only for the limited purpose of showing that similar representations made to the other witnesses were made intentionally and purposely, not accidentally. McCormick on Evidence, § 164.

### Findings of Fact

Woodbourne Avenue runs east from York Road to and beyond The Alameda and Loch Raven Boulevard in the northern part of Baltimore City. The block between York Road and Ready Avenue is commercial. East of Ready Avenue both sides of Woodbourne Avenue are residential, with single-family and multi-family houses.

In recent years the Negro population has been moving north, occupying more and more houses between York Road and The Alameda. At the beginning of 1969 there were some Negro homes on Glenwood Avenue and Tunbridge Road, the next streets to the south and to the north of Woodbourne Avenue.

The defendants, Elaine Mintzes and her husband, Alvin S. Mintzes, are engaged together in the real estate business, as Castle Realty Co. The broker's license is in the husband's name. In January 1969 Mrs. Mintzes undertook to assemble a group of properties on Woodbourne Avenue which a corporation known as Harrow, Inc., wished to purchase, subject to a reclassification of the existing zoning, so that an apartment building could be erected thereon.

The nature of the understanding between the Mintzes and the prospective purchaser is not shown by the evidence, but it is clear that Mrs. Mintzes was to assemble the group of properties by obtaining a "listing contract" from each of the owners, authorizing Castle Realty Co. to sell the property for a specified price and to be paid the customary commission by the seller, and promptly thereafter to present to the owner or owners a contract of sale by Harrow, Inc., conditioned, at the election of the buyer, on obtaining a reclassification of the zoning. From the weight of the credible evidence, the Court has found that defendants made the representations set out below.

Mrs. Mary E. Abel, a widow, owns 709 Woodbourne Avenue, improved by a house which was converted into a two-family dwelling after her children married and left the house five or six years ago. The second floor was rented to a tenant in January and February 1969. In the latter part of January 1969 Mrs. Mintzes telephoned Mrs. Abel and asked if she wanted to sell. When Mrs. Abel said "No", Mrs. Mintzes said that she wanted to come and talk to her, and that after talking Mrs. Abel would want to sell. Mrs. Abel's son and daughter attended the meeting, at which Mrs. Mintzes stated that whether Mrs. Abel sold or not, high rise apartments would be built on the properties already signed up, that the apartments would be "integrated", that it was a "changing neighborhood" and that the neighborhood would be very undesirable because of an "undesirable element". Mrs. Abel did not sign the listing contract at that meeting. Mrs. Mintzes called her again and began to "pressure" her by referring to the "changing neighborhood". On one occasion Mrs. Abel telephoned defendants' office to tell them she did

not wish to sell her house. Mr. Mintzes spoke to her and referred to the "changing neighborhood" in an effort to persuade her to change her mind. These statements by Mr. and Mrs. Mintzes were not the result of any questions or subjects brought up by Mrs. Abel and her children, but were volunteered by Mr. and Mrs. Mintzes. Mrs. Mintzes also referred to the undesirability of having an apartment house next door. Mrs. Abel finally signed a listing contract and a sales contract.

Mrs. Mintzes used the expression "changing neighborhood" in a considerable number of conversations, some on the telephone, with the several owners. That expression was used and understood to mean that Negroes were moving into the neighborhood.

Mr. and Mrs. Harold A. Slater owned and lived in the property 711 Woodbourne Avenue with a tenant occupying one floor. The husband is an electrician, the wife a part-time worker at the Govans Library. Mrs. Mintzes came to see them after talking briefly with Mr. Slater on the phone. She began her conversation by telling them how afraid she had been while driving along Broadway in the "colored neighborhood" on the way out. She referred to the "changing neighborhood" in which the Slaters lived and the difficulty they would have in obtaining white tenants. When the Slaters said that they might rent to "colored tenants", Mrs. Mintzes went into details about the difficulties of renting to "colored tenants". The Slaters then signed a listing contract, but promptly thereafter retained an attorney in an effort to set it aside. When this effort failed they signed a sales contract.

Mr. and Mrs. Robert J. Lincoln have owned and occupied a single-family dwelling on the north side of Woodbourne Avenue since 1965. In 1968 one of the persons interested in Harrow, Inc., had approached Mr. Lincoln with an offer to buy their house, and Lincoln had said that he was not interested. In February 1969 Mrs. Mintzes called Lincoln on the telephone and asked if he would let her sell his home for a commission. Lincoln said that he was not ready to sell yet. Mrs. Mintzes then said that the neighborhood was deteriorating and that it had turned "colored" right up to the south side of Woodbourne Avenue, but Lincoln still refused to sell.

As noted above, under "Coverage", Frank Ragonese owns the vacant lot known as 611 Woodbourne Avenue. Mrs. Mintzes called him on the telephone several times and tried to persuade him to sell. As an argument to sell she referred to the "changing neighborhood". Ragonese replied: "I know what [you] mean and that means nothing to me". In subsequent telephone calls Mrs. Mintzes brought up the subject, either expressly referring to "colored people" or using the euphemism "changing neighborhood".

■ The Court finds as fact that the representations found to have been made by Mrs. Mintzes and the one representation found to have been made by Mr. Mintzes to Mrs. Abel were not made inadvertently, nor except in one instance in answer to questions asked by the person to whom they were talking. All representations (except one answer to a question by Mr. Lincoln) were volunteered, deliberately, as part of a calculated attempt to induce the Slaters, the Lincolns and Mrs. Abel to sign the listing contracts and to sell their dwellings.

### Intent

■ Defendants contend that plaintiff must also prove that defendants made the alleged representations with the intent to deny to persons protected by the Act a right granted by the Act. The Court holds, however, that the requisite intent need only be to make the representations referred to in § 3604(e) for the purpose of inducing a person to sell or rent a dwelling, and, of course, for profit.

### "For Profit"

■ The words "for profit" in section 3604(e) mean for the purpose of obtaining financial gain in any form.

The words were not used in any technical sense, as they are in certain tax laws, and should be given their ordinary dictionary meaning. Webster's International Dictionary, Second Edition, defines "profit" as meaning "Accession of good; valuable results; useful consequences; avail; gain; as, an office of profit", as well as meaning "the excess of returns over expenditures" or "the excess of income over expenditure".

The words "for profit", as used in section 3604(e) include the purchase of property by prohibited means with the hope of selling it for a larger price, but the words are not limited to such a transaction. They were evidently included in § 3604(e) to distinguish and eliminate from the operation of that subsection statements made in social, political or other contexts, as distinguished from a commercial context, where the person making the representations hopes to obtain some financial gain as a result of the representations. See Halstead v. S.E.C., 86 U.S.App.D.C. 352, 182 F.2d 660, 668 (1950). The inclusion of statements made in social or political contexts would have raised serious First Amendment problems.

■■■ Similar problems would arise if the Act were applied to an honest answer to a question put by the owner of a dwelling.[3] As we have seen, only one of the representations relied on by the plaintiff in this case was made in response to a question. The Court holds that the testimony with respect to the answer by Mrs. Mintzes to Mr. Lincoln's

question should be stricken and disregarded.

The other representations to them, to the Slaters and to Mrs. Abel and her son and daughter were made voluntarily and deliberately as part of an attempt to induce the owners to sign the contracts. Those representations violated § 3604(e).

### Constitutionality

Defendants challenge the constitutionality of the prohibition in § 3604(e), generally and as applied in this case, where no impact on interstate commerce has been shown. This Court agrees that the constitutionality of § 3604(e), as sought to be applied in this case, cannot be sustained by the commerce clause. Nor can it be sustained by § 5 of the Fourteenth Amendment, since it is not contended that defendants were acting under any color of state authority or practice.[4] The Supreme Court has repeatedly refused to apply the Fourteenth Amendment to protect an individual against acts done by other individuals where no color of state authority is involved. See United States v. Guest, 383 U.S. 745, at 755, 86 S.Ct. 1170, 16 L.Ed. 2d 239 (1966).

There remains the question whether the constitutionality of § 3604(e) may be sustained under the Thirteenth Amendment, as construed by the Supreme Court in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). In that case the Court held that the denial of housing in

3. The case of Abel v. Lomenzo, 25 A.D.2d 104, 267 N.Y.S.2d 265 (1966), aff'd 18 N.Y.2d 619, 272 N.Y.S.2d 771, 219 N.E. 2d 287 (1966), cited by defendants, did not discuss any constitutional question, but held that advising prospective purchasers as to the racial composition of different neighborhoods did not violate a so-called blockbusting rule promulgated by the Secretary of State to regulate the activities of real estate brokers. The rule sought to prohibit the practice of soliciting sales of residential property on grounds of loss of value of properties due to prospective or present entry into a neighborhood of homeowners of differ-

ent race or origin. The Court said that as long as the information given by the brokers to those employing them "is accurate and neither in content nor purpose seeks to encourage racial bias as regards housing, it is unexceptionable."

4. Certain types of blockbusting have been prohibited by § 230A of Article 56 of the Annotated Code of Maryland. Article 19, § 114(c) of the Baltimore City Code, as amended by Ordinance No. 51, approved May 6, 1968, indexed under "blockbusting", prohibits certain false representations.

a private development because the party seeking it was a Negro violates the provision of the 1866 Civil Rights Act, granting to all citizens of the United States "the same right * * * as is enjoyed by white citizens * * * to inherit, purchase, lease, sell, hold, and convey real and personal property". 42 U.S.C.A. § 1982. The Court interpreted the Act to reach strictly private interference with those rights, and found authorization for such congressional regulation of private conduct in the Thirteenth Amendment, which contains no "state action" limitation and under authority of which the Act was originally passed. The Court held that the enabling clause grants Congress the power not only to outlaw forced labor but also to identify "badges and incidents of slavery" and to pass legislation "necessary and proper" to eliminate them. 392 U.S. at 439, 400, 88 S.Ct. 2186. It was not irrational, the Court stated, for Congress to find that discrimination against Negroes in the sale of private property constituted such a "badge". The Thirteenth Amendment contains a "promise of freedom" which might become a "mere paper guarantee" if Congress could not act to secure at least the "freedom to buy whatever a white man can buy, the right to live wherever a white man can live". 392 U.S. at 440–443, 88 S.Ct. at 2205.

It would not be appropriate for a trial judge with a crowded docket to review the history of the Thirteenth Amendment in the courts or to attempt an analysis of all the questions raised and not answered by *Jones*. That is being done by the law reviews, e.g., 82 Harv. L.R. 1294. It is necessary and appropriate to recognize some of the problems, such as the countervailing value of privacy and the question of equal protection, if only to show that they are not problems in this case, since neither the rights of "Mrs. Murphy" nor any other rights of privacy are involved, and § 3619, the separability section in the Fair Housing subchapter, removes the equal protection problem from this case.

Constitutional justification for the provision in question here, § 3604(e), must be found in the decision of the Supreme Court in *Jones* that 42 U.S.C.A. § 1982, which the Court construed to bar all racial discrimination, private as well as public, in the sale or rental of property, was a valid exercise of the power of Congress to enforce the Thirteenth Amendment. In the light of that ruling, it seems clear that the Fair Housing provisions of the 1968 Act are sustainable under the Thirteenth Amendment if and insofar as they are rational means of effectuating the stated policy of the legislation: "to provide, within constitutional limitations, for fair housing throughout the United States". See § 3601.

Only one reported case has dealt with that problem, Brown et al. v. State Realty Company, 304 F.Supp. 1236 (N.D.Ga., Atlanta Div.), Smith, D. J., September 2, 1969.

In that case Judge Smith concluded that "it is recognized that the practices condemned by the provision [§ 3604(e)] impede the rights granted in § 1982 and constitute a fundamental element in the perpetuation of segregated neighborhoods, racial ghettos and the concomitant evils which have been universally recognized to emanate therefrom. Such iniquitous conduct, trafficking as it does on the fears of whites and the desperation of Negroes, clearly affects equality in housing and is abhorred by all citizens, regardless of their personal views on the racial question". 304 F.Supp. at 1240.

This Court concludes that the provisions of § 3604(e) are a rational and not unreasonable means of effectuating the stated policy of the legislation "to provide, within constitutional limitations for fair housing throughout the United States", § 3601, and that § 3604(e) is a valid exercise of the power of Congress to enforce the provisions of the Thirteenth Amendment.

*Pattern or Practice*

The phrase "pattern or practice" is not defined in the Act, and is not ex-

plained by the legislative history. The phrase has been used in similar statutes. The number of incidents necessary to show a pattern or practice depends upon the nature of the right protected and the nature of the ordinary violations of such right. Both sides in this case have relied upon United States v. Mayton, 335 F.2d 153, at p. 159 (5 Cir. 1964), where the Court said:

> "The words pattern or practice were not intended to be words of art. No magic phrase need be said to set in train the remedy provided in § 1971(e). Congress so understood them. And the legislative history reflects the adoption of the approach epitomized by Deputy Attorney General Walsh before the House Judiciary Committee:

>> " 'Pattern or practice have their generic meanings. In other words, the court finds that the discrimination was not an isolated or accidental or peculiar event; that it was an event which happened in the regular procedures followed by the state officials concerned.'

> "That interpretation was reiterated by Mr. Walsh in subsequent testimony, and it was confirmed on the floor of the Senate by Senator Keating on the day the Act was passed:

>> " 'The "pattern or practice" requirement means only that the proven discriminatory conduct of the defendants was not merely an isolated instance of racial discrimination'."

In determining the meaning of "pattern or practice" as used in § 3613, defendants ask the Court to consider the alternative methods of enforcement. Section 3610 provides that a person who claims to have been injured by a discriminatory housing practice, or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur, may file a complaint with the Secretary of Housing and Urban Development, who shall attempt to correct the alleged discrimina-tory housing practice by informal methods of conference, conciliation and persuasion. If the Secretary is unable to obtain voluntary compliance within a specified period, the party aggrieved may within 30 days thereafter "commence a civil action in any appropriate United States district court, against the respondent named in the complaint to enforce the rights granted or protected by this subchapter", subject to certain provisos. Section 3612 provides for the enforcement of the rights granted by §§ 3603–3606 inclusive by private civil actions. The remedies provided by § 3610 and § 3612 will be effective in certain types of cases, but in such a case as this conciliation has little or nothing to work on and a private civil action would be prohibitively expensive for the parties to whom the representations were made, who do not stand to gain or lose any money or property by the outcome of such a suit.[5] This case would therefore appear to be an appropriate case for enforcement by the Attorney General if the number of representations made by defendants is sufficient to show a pattern or practice.

■■■■ In the present case defendants made unlawful representations to the owners of three properties. In several instances the representations were repeated during a long interview and reiterated in subsequent telephone conversations. They were not made accidentally or as isolated instances, but were made intentionally and deliberately as part of an effort to assemble a group of properties for an apartment house. The evidence before the Court indicates a disposition on the part of defendants to use racial representations in circumstances where it appears that such representations may be effective in inducing the owner to sell. Neither of the defendants took the stand to deny the statements or to testify to their general practice. This did not change the burden of proof on the government, but it permits the Court to draw inferences

---

5. The rezoning failed and the contracts of sale were cancelled.

which defendants' testimony might have prevented.

All factors considered, the Court concludes that the representations proved establish a pattern or practice of resistance to the full enjoyment of the rights granted by subchapter 1 of the Fair Housing Act, within the meaning of § 3613.

### Relief

Plaintiff is entitled to injunctive relief against further violations of § 3604(e) by defendants. Although only one illegal representation by Mr. Mintzes was proved, it was a part of the pattern in which he, the holder of the broker's license, and his wife engaged, and he should be included in the injunction.

In future cases, the Court may well include provisions for reporting and maintenance of records, as requested by plaintiff. But, since this is the first case brought under §§ 3604(e) and 3613, and so few instances of prohibited representations have been proved, the Court has concluded that the injunction in this case should not include provisions for reporting and maintenance of records.

The Court will retain jurisdiction of the case to insure compliance with the decree.