**UNITED STATES of America, Plaintiff-Appellant,**

v.

**PELZER REALTY COMPANY, INC., and William G. Thames, Defendants-Appellees.**

**No. 72–1609.**

United States Court of Appeals, Fifth Circuit.

Sept. 5, 1973.

Rehearing and Rehearing Denied Nov. 19, 1973.

Ira De Ment, U. S. Atty., Montgomery, Ala., Norman Goldberg, Frank E. Schwelb, Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant.

James Garrett, Montgomery, Ala., for defendants-appellees.

Before COLEMAN, MORGAN and RONEY, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

In a civil action, the United States charged the Pelzer Realty Company, Inc., and its president, William G. Thames, with violating Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq. (the Fair Housing Act).[1] The complaint alleged that the defendants refused to sell homes to black people and discriminated against them in the terms and conditions of the purchase of dwellings. Jurisdiction was asserted under 42 U.S.C. § 3613 and 28 U.S.C. § 1345.[2]

The district court decided the case on the pleadings, affidavits, stipulations and depositions.[3] It found that no discrimination was shown, denied relief and dismissed the complaint. We reverse.

## I

### The Complaint

In its complaint the United States alleged that the defendants pursued a policy and practice of discrimination by (1) refusing to sell homes to black persons and by (2) discriminating against black persons in the terms and conditions of the purchase of a dwelling. Furthermore, the United States alleged that "[t]he denial to black persons of the right to equal opportunity in housing described in this complaint raises an issue of general public importance." The United States sought to enjoin the defendants from (1) "discriminating against any person in relation to the sale of a dwelling on account of race, color, religion, or national origin; and (2) failing or refusing to take all necessary and appropriate affirmative steps to correct the continuing effects of its discriminatory practices."

---

1. 42 U.S.C. § 3604 provides in pertinent part:

   As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—

   (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin.

   (b) To discriminate against any person in the terms, conditions, or provisions of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin.

2. 28 U.S.C. § 1345 provides:

   Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.

   42 U.S.C. § 3613 provides:
   Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this subchapter.

3. The district court in its pretrial order permitted the case to be so submitted. Rule 16, Fed.R.Civ.P.

## II

### Facts of the Case

#### A. Barnett & Marshall.

The complaint is based primarily on the defendants' treatment of two black men, Nexton Marshall, Jr. and Arthur Barnett. On May 20, 1970, Marshall, assistant to the president of Alabama State University, saw a Pelzer Realty Co. advertisement for homes in Seth Johnson Estates, in Montgomery, Alabama. He then called his friend, Barnett, head of the placement office at Alabama State, who was also interested in buying a house. Marshall arranged for his wife, Barnett and Barnett's wife to meet a Pelzer agent, Charles Flanagan, at Seth Johnson Estates to look at the homes. After that meeting, the Barnetts and the Marshalls decided they wanted to buy homes from Pelzer in Seth Johnson Estates.

The next day Marshall and Barnett met with Flanagan and defendant Thames at the Pelzer Realty offices in Montgomery. At that meeting, Thames told Marshall and Barnett that if he sold two of his 12 vacant houses in Seth Johnson Estates to them he would have a hard time selling the rest of the houses. Thames also offered to build identical houses for the two men at the same price in another part of town. (Thames' lawyer later suggested to a lawyer representing Barnett and Marshall that Thames was willing to build identical homes for the men at the same price "in any black neighborhood.") At the same meeting Thames told the men they could probably force him to sell them the houses by suing him, but that he could tie the case up in court for so long they would no longer want the houses.

It was then agreed (at Marshall and Barnett's suggestion) that the two men would try to find other purchasers. Thames told them that if they found seven other purchasers he would not charge them closing costs [4] and that if they could not find the other purchasers they would have to pay closing costs.

Between May 21 and June 5 Barnett and Marshall tendered token binder checks to Pelzer and signed purchase contract forms (offers to buy). These forms were never signed by Thames, so a contract was never formed.

By June 5, 1970, buyers for the other houses had not been found, and Thames told the two men that unless they found the additional buyers they would have to pay the closing costs on their homes. Thames also said that he wanted a $500 binder from each of them. These additional binders were never paid.

About June 10, Thames told Flanagan that he had found that Barnett had once dishonored a purchase agreement with another realtor, and that he (Thames) thought the two men were just testing the market. He instructed Flanagan to tell the two men that the houses had been sold, withdraw the offers and return the token binders. Thames also, as the district court found, entered into fictitious contracts to sell the houses in which Barnett and Marshall were interested. The district court found that this sham was for the purpose of foreclosing the right of Barnett and Marshall to recontract for the houses.

#### B. Closing Costs.

The second phase of the government's case against the defendants consists of evidence that Pelzer as a general practice charged closing costs to black buyers but not to white buyers. All of Pelzer's Montgomery customers were white, and all its Tuskegee customers were black. It also found that although white buyers in Montgomery usually paid no closing costs and black buyers in Tuskegee always did, this practice was caused by variations in the geographical markets and not by racial discrimination.

#### C. Letters.

Finally, the government introduced into evidence several letters sent out by

---

4. The exact number is disputed.

Pelzer to prospective customers and argued that the letters Pelzer sent to customers who identified themselves as black were less enthusiastic and helpful than the letters sent to prospective purchasers who did not identify themselves as black. The court found no merit to this argument.

## III

### Violations of Title VIII

Although the district court found the facts in this case to be substantially similar to the above summary, it concluded that Barnett and Marshall had not been discriminated against because Thames never refused to sell them the houses. In fact, the court found that he specifically admitted that the law forced him to sell them the houses. But we conclude that Thames committed at least three violations of the Fair Housing Act.

A. Grudging acceptance of a customer can hardly be equated with the aggressive sales techniques used by Thames and his agents on other occasions. The court below found that, "Flanagan told Barnett that because Seth Johnson was a white neighborhood, there might be problems with the sales. . . ." At the meeting the next day, the court found, "it was agreed that Thames had 12 vacant houses in Seth Johnson Estates and that, if he sold one or two of them to blacks, he would have a very difficult time selling the others. . . ." It was at this same meeting that Thames told the two men that they could force him to sell them the houses, but he might tie the case up in litigation for so long they wouldn't want the houses when it was over.

■ Thames violated § 3604(a) when he offered to build identical houses for them in another part of town, and when he threatened to force them into litigation before selling the houses. (This is not to say that a person cannot indicate an intention to challenge a law he believes in good faith to be unconstitutional or otherwise invalid. But that

was not what Thames had in mind, since he told Barnett and Marshall they would probably win by suit.) By these statements, Thames and Flanagan let the two men know that they were not particularly welcome as customers, and, while they could get the houses if they really wanted them, they would have trouble doing so. This attitude, which we take to be an honest appraisal of the salesmen's sentiments, certainly had an effect on the two men, and upon their willingness and ability to bargain with Thames. In addition, the statements paved the way for Thames' manipulation of the closing costs.

B. One of the government's crucial assertions in this case is that the two black men were required to find other buyers before Thames would pay their closing costs, but white purchasers of Pelzer homes never paid closing costs. There was uncontradicted evidence in the record that no other buyers of Seth Johnson homes paid closing costs, nor were any white buyers asked to find other buyers. Defendants, however, emphasize that closing costs are an element to be bargained about just like any other aspect of a contract, and that they charged buyers closing costs whenever the market would permit.

This outwardly appealing argument contains two flaws. First, in its advertisements for homes in Montgomery, and in some of its correspondence, Pelzer advertised that it paid closing costs for its customers. Even if this policy were nothing more than a gimmick to attract buyers, the practice of Pelzer in Montgomery was to pay closing costs, and defendants' treatment of Barnett and Marshall was a departure from this practice.

Second, it is apparent from the nature of Pelzer's business that payment of closing costs was not merely a gimmick. Most Pelzer homes were relatively inexpensive, the company doing a large portion of its business with military families. Nearly all Pelzer homes were financed with government loans, either through the Veterans Administration (VA) or the Federal Home Administra-

tion (FHA). Such homes must be appraised by a government appraiser. See 12 U.S.C. § 1709, 38 U.S.C. § 1810. Thus, when a home is financed entirely by one of these loans, the cash price of the home is partially removed from the bargaining, and the question of who pays the closing costs becomes extremely important. For this reason, the payment of closing costs by the realtor in this situation is not merely a sales gimmick, but a means of price competition.

The district court found that "no white man was ever given the opportunity to save closing costs (including prepaid items), though Thames did, at a later date, advertise that he would waive closing costs on purchase of certain homes." But it appears that the court meant that no white was ever given the opportunity to save closing costs by going out and soliciting other buyers. There was no evidence introduced that any other buyer of a home in Seth Johnson Estates ever had to pay closing costs at all. In fact, two affidavits from white residents of Seth Johnson stated that they did not pay closing costs and that they were not asked by Thames to seek other purchasers.

■ We find that Thames' demand that Barnett and Marshall find other buyers before they could avoid payment of closing costs was discriminatory treatment, and we find further that this discriminatory treatment was racially motivated. It therefore violated 42 U.S.C. § 3604(b). The district court found specifically that "these circumstances would not have occurred in a proposed sale to a white." We agree.

■ ■ We need not and do not find that racial prejudice dominated Thames' mind during the negotiations. It is enough that race was one significant factor he considered in his dealings with the men. Defendants and their attorney continually reiterated Thames' concern with his financial investment in the unsold houses in Seth Johnson Estates. We do not doubt that his primary goal was to make money, not to violate the Fair Housing Act. But it is not necessary to show that Thames intended to deprive Barnett and Marshall of rights granted by the Act. A violation occurred because his words had that effect. United States v. Mintzes, D.Md., 1969, 304 F.Supp. 1305. See also, Banks v. Perk, N.D.Ohio, 1972, 341 F.Supp. 1175.

C. The district court correctly found that "Thames entered into a fictitious contract to sell the houses" and that "[t]his sham was obviously for the purpose of foreclosing the right of Barnett and Marshall to recontract for one or more of the houses." This finding is repeated verbatim in both the district court's findings of fact and conclusions of law, except that in the conclusions of law the word "fictitious" is replaced with the word "dummy." Either way, we agree.

The court, however, declined to find that this deception was racially motivated and violative of § 3604(a) because it might have been carried out "to avoid the necessity of a personal slight to Mr. Marshall or to Mr. Barnett or to avoid possible ill will involved in refusing to sell to Mr. Marshall or Mr. Barnett because they both appeared to be facing credit problems. . . ." The court then adds, "No court should infer bad faith or a bad will when good faith or good will is equally as logical under the circumstances."

■ With due respect to the district court, we do not feel that good faith or good will is equally logical under the circumstances of this case. Thames and Flanagan had already informed Barnett and Marshall about the trouble they were causing by trying to buy the houses. Thames had already let them know that he wanted them to go out and sell the houses, presumably to other blacks, so that he wouldn't be unable to sell the rest of the houses to whites after selling two houses to blacks. Thames had already told the men that they had the right to take him to court, but that the resulting suit would be long and costly.

No white person was ever forced to go through all these dealings with Thames and Flanagan. We are unable to reach any conclusion other than this: that Barnett and Marshall were treated differently than other Pelzer customers. The sham sales contract and the deceptive sign placed outside the houses fit perfectly into the pattern of discrimination Barnett and Marshall were subjected to, and this court is drawn inexorably to the conclusion that these actions were racially motivated. The placing of "sold" signs in front of the houses in order to foreclose the right of Barnett and Marshall to recontract for the houses violates 42 U.S.C. § 3604(a).

In addition to defendants' dealings with Barnett and Marshall, we have also considered the district court's findings with respect to the variations in closing costs between Montgomery and Tuskegee, and with respect to the letters written to prospective customers. We find no error in the district court's findings in these two areas.

## IV

### Enforcement by the Attorney General

In order to bring an enforcement action under § 3613, one of two requirements must be met. One possibility is that the Attorney General must have reasonable cause to believe that a person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by the Fair Housing Act. The second possibility is that he must have reasonable cause to believe that any group of persons has been denied any of the rights granted by the Act and that such denial raises an issue of general public importance. In his complaint the Attorney General alleged fulfillment of both of these requirements, although only one is required.

The district court, finding that no discrimination existed, never reached the issue of compliance with § 3613, except in one sentence of its opinion: "While the government's proof tends to show that this isolated set of circumstances resulted in possible discriminatory treatment of two blacks in seeking to buy houses from Mr. Thames (more properly, from Pelzer Homes, a nondefendant), it has not been proved that such was a part of a pattern or practice of discrimination or that the blacks were prejudiced thereby."

In a case which concerned violation of a different subsection of § 3604, a Maryland district court correctly cited United States v. Mayton, 335 F.2d 153, 158 (5 Cir., 1964) for the proposition that, "The words *pattern or practice* were not intended to be words of art." United States v. Mintzes, *supra*, 304 F. Supp. at 1314. The court went on to note that the Fair Housing Act provided alternative remedies for its violation, and in considering the appropriateness of a remedy under § 3613, a court should look to the feasibility of alternative remedies. The court said that "in such a case as this conciliation has little or nothing to work on and a private civil action would be prohibitively expensive for the parties to whom the representations were made, who do not stand to gain or lose any money or property by the outcome of such a suit." *Id.*

This is a similar situation. The Act has been violated. A private suit by Barnett or Marshall would yield nothing to the two men. The Attorney General and his staff have determined that the case is sufficiently important that they have decided to bring their own suit to enforce the provisions of the statute. The case is a good example of the kind of action which should be brought by the government when violations of the Act are brought to its attention.

■ It is true that a court must exercise independent judgment as to whether the requirements of § 3613 are fulfilled before granting relief to the government in a suit such as this one. The Attorney General is not authorized to enjoin any violation of the Fair Hous-

ing Act; if he were, the requirements of § 3613 would be meaningless. We do feel, however, that a court's standard of review of the Attorney General's decision to bring an action under § 3613 should be a limited one. There need not be an actual pattern or practice of resistance or an actual denial that raises an issue of general public importance. The only requirement is that the Attorney General have *reasonable cause* to believe that such conditions exist.

■ To fulfill the "pattern or practice" requirement, the discriminations must result from more than an isolated or accidental or peculiar event. United States v. West Peachtree Tenth Corp., 5 Cir. 1971, 437 F.2d 221, 227. See United States v. Hunter, 4 Cir. 1972, 459 F. 2d 205, 217. The government must show that any discriminatory act by the defendants was not an isolated or accidental departure from otherwise nondiscriminatory practices.

■ Under either of these tests, the defendants' actions in this case qualify as a pattern or practice. The case is not based on a single remark made to Marshall and Barnett during a long series of negotiations. It is not based on an off-hand comment made to one person on a single occasion. The government's complaint is based on the treatment received by two men over a period of several weeks. Several of the remarks were repeated by different people at different times, and the defendant Thames had plenty of time to reflect on the deal he offered the two men. The record shows that he was, in fact, quite concerned about this transaction. Thames was attentive to what was happening; nothing slipped by him. The treatment received by Barnett and Marshall resulted from the policy of Pelzer Realty Company, as enunciated and implemented by its president, Thames.

In view of our finding that the Attorney General could reasonably have believed that a pattern or practice of discrimination was engaged in, we need not reach the question of whether there was reason to believe that a group of persons had been denied rights guaranteed by the Fair Housing Act.

V

Standard of Review

We are thus forced to conclude that the district court erred in finding that Barnett and Marshall were not discriminated against in their dealings with Thames and Flanagan. In reaching this conclusion, we have used nearly all the findings of fact of the district court as they are presented in its opinion. We have merely chosen to place different emphasis on some of the facts, which we have described above. In general, we do not disagree with the findings of fact made by the district court. We do, however, feel that the court failed to attribute the proper degree of significance to certain actions of Pelzer Realty Company and its agents.

In considering the government's appeal, we are aware of the fact that the case was submitted to the district court on the pleadings, stipulations and depositions. Nevertheless, we must leave the district court's findings of fact undisturbed unless we find them to be "clearly erroneous." F.R.Civ.P., Rule 52(a). Volkswagen of America, Inc. v. Jahre, 5 Cir. 1973, 472 F.2d 557. However, we are able to consider everything that the trial judge was able to consider.

The appellant's burden, under Fed. R.Civ.P. 52(a), of showing that the trial judge's findings of fact are 'clearly erroneous' is not as heavy as it would be if the case had turned on the credibility of witnesses appearing before the trial judge . . . Sicula Oceanica, S. A. v. Wilmar Marine Eng. & Sales Corp., 5 Cir. 1969, 413 F.2d 1332, 1333.

■ The only finding of fact of the trial judge which we feel compelled to

find clearly erroneous under Rule 52(a) is his finding that the defendants did not refuse to sell the houses to Barnett and Marshall.

The *Sicula Oceanica* case teaches that it is our duty, when these cases are presented for review, to study the entire record thoroughly and to determine whether we are "left with the definite and firm conviction that a mistake has been committed." (citation omitted) Volkswagen of America, Inc. v. Jahre, *supra*.

In this case, we are left with the definite and firm conviction that the defendants refused to sell the two houses to Barnett and Marshall. In an ordinary situation, a real estate dealer tries to give a customer every opportunity to complete a transaction, consistent with maintaining his investment. He does not put "sold" signs in front of a house before it is really sold. That kind of action is not consistent with common sense or ordinary business practices. To reemphasize what the district court said in its opinion, "[T]hese circumstances would not have occurred in a proposed sale to a white. . . ."

## Conclusion

The relief requested by the government in this case is really very limited. To demand that the defendants stop "discriminating against any person in relation to the sale of a dwelling on account of race, color, religion, or natural origin" is asking nothing more than that they comply with the law as it has been enacted by Congress. The second prong of the relief is nothing more than a demand that the defendants neutralize whatever may have been the effects of their past noncompliance with the Act. Even Mr. Thames testified that he was not sure whether he had discriminated against blacks in the past. We are sure that in this spirit of compromise and reconciliation, the parties and the district court will be able to work out a decree not inconsistent with this opinion.

Reversed and remanded.