Sylvester MARABLE, Plaintiff-Appellant,

v.

H. WALKER & ASSOCIATES, et al., Defendants-Appellees.

No. 79-2508.

United States Court of Appeals, Fifth Circuit. Unit B

May 4, 1981.

Rehearing Denied May 27, 1981.

---

Robert L. Wiggins, Jr., Birmingham, Ala., for plaintiff-appellant.

Robert R. Sexton, Birmingham, Ala., for defendants-appellees.

Before MORGAN, FAY and FRANK M. JOHNSON, Jr., Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

Sylvester Marable brought this suit alleging that defendants Harold and Francis Walker refused to rent an available apartment to him because he is black, in violation of the Fair Housing Act, 42 U.S.C.A. § 3604 et seq., and 42 U.S.C.A. §§ 1981, 1982. After defendants answered that their policy was to rent only to married couples and that Marable was denied tenancy because he applied as a single male, Marable amended his complaint to add a claim of sex discrimination in violation of 42 U.S.C.A. § 3604. The district court rendered judgment for defendants after a non-jury trial, concluding that the defendants did not discriminate against Marable on the basis of either race or sex. The district court found that the apartment was denied to Marable

because he had a credit report that showed him to be an unacceptable tenant, he was single and the apartment complex had a policy of renting to families and married persons only, and he "constantly harassed" defendants about his application after it was submitted.

Marable appeals, contending that the district court erred first in failing to conclude that defendants' policy of not renting to single males is a violation of 42 U.S.C.A. § 3604 because it is explicitly sexually discriminatory, and second in failing to conclude that the single male exclusionary policy was not applied equally between blacks and whites since defendants had made exceptions for white single males, but no blacks—single or married—had ever been accepted as tenants at the Traces Apartments. Marable also assigns error in the trial court's failure to consider whether the putative reasons for his rejection as a tenant were standards or criteria that were applied equally to white rental applicants and in its failure to consider the related question whether the asserted reasons were a mere pretext for racial discrimination.

Defendants Harold and Francis Walker own the Traces Apartments, a 56-unit apartment complex located in a predominantly white suburb of Birmingham, Alabama.[1] Each of the apartments has either two or three bedrooms. When these apartments were first being rented, beginning in April 1974, defendants rented to at least eight single males [2] and also to tenants with poor or no credit histories,[3] with poor or unverified employment records,[4] and with poor or no rental histories.[5] Thereafter, defendants adopted a policy of renting to married couples and families,[6] in part, Mrs. Walker stated, because they had some trouble with single male tenants. Francis Walker became the managing partner of the Traces Apartments on February 3, 1976. She testified at trial that since that time no single males had rented apartments and that only three single females and one widow had rented at the Traces. However, she stated that applications were taken from singles on a case by case basis. Mrs. Walker testified that from 1974 until 1978, the time of trial, out of 209 tenancy turnovers, defendants had rented to 22 non-married tenants, including ten single white males.[7]

1. Defendants Harold and Francis Walker now have 100% ownership interest in the Traces Apartments. Prior to February 3, 1976, the Walkers were part-owners with Mr. and Mrs. Leonard Hultquist.

2. Francis Walker testified that eight single males occupied apartments in 1974. She also testified that ten single males had occupied apartments up to the time of trial.

3. Defendants rented to at least two tenants who had gone into personal bankruptcy and who had had accounts turned over to collection agencies, and rented to at least seven other tenants who had been sued for collection of debts. One tenant had no credit references whatsoever and another had a history of late payments on his credit accounts. The evidence at trial showing the poor credit histories of these tenants was undisputed. Defendants did not deny that they or the resident managers were aware of these poor credit histories. Francis Walker testified at trial that credit reports were not required of all applicants. She even admitted that she would not have been surprised to learn that 73 of the 209 tenants who had rented at the Traces had not had their credit histories evaluated by independent credit reports.

4. Defendants rented to numerous tenants whose employment was not verified and to others who were unemployed at the time they were accepted as tenants. Marable introduced evidence showing that 172 out of 213 white applicants did not have their incomes verified in their credit reports. Mrs. Walker testified at trial that credit reports are not required of all prospective tenants—only a "majority."

5. Defendants rented to at least one tenant who had been evicted from another apartment for non-payment of rent. Several applicants who had never previously rented were accepted as tenants.

6. Mark Hammond, the resident manager of the Traces Apartments at the time Marable applied, testified at trial that he was not aware of the policy of not renting to singles until Marable applied. However, Hammond also stated that Marable was the first single male to apply since he had been working as resident manager.

7. Marable introduced evidence that defendants rented to 28 single white males and 25 single white females.

She testified that the Traces Apartments had never had a black tenant.

Sylvester Marable submitted his application for tenancy in the Traces Apartments in November 1976. The resident manager, Mark Hammond, showed Marable a vacant apartment and told him that he would be contacted in a few days about his application. Marable was accompanied during his first visit to the Traces Apartments by his fiancee.[8] He testified that he told Hammond of his anticipated marriage in December 1976 but Hammond contradicted this testimony, although Hammond stated that he assumed at that time that Marable and his companion were married. After Hammond showed him the apartment, Marable and his fiancee returned to the resident manager's office where he completed a credit application. No deposit was placed.[9] Shortly after Marable left, Hammond telephoned the credit information to a credit reporting company named Equifax, which proceeded to prepare a credit report on Marable. Several days later, Marable was contacted by a Mrs. Sims, from Equifax, for the purpose of interviewing Marable concerning the facts stated on the credit application given to Hammond.[10]

The Equifax credit report on Marable, which was defendants' only source of information regarding his credit standing, disclosed that Marable had worked for the Feather Corporation as a public affairs consultant at an estimated annual salary of $14,000 for the previous 8½ months. The report noted that Equifax had been unable to contact Feather or determine the type of business in which it was engaged; it described the nature of the business as an "independent corporation."[11] However, the report also indicated that Marable worked full time steadily and that his prospects for continued employment were regarded as good.[12]

The Equifax credit report also contained the results of an investigation of credit references supplied by Marable. The report listed his account with a music company as satisfactory and noted that an account that he had set up with a furniture company had never been used. A jewelry store at which Marable had an account was listed as having a policy of not disclosing credit information.[13] A bank loan account (for an automobile) listed in the report showed that Marable had borrowed $10,689, that $6,104 was owed at the time of the report, and that the loan terms included 42 payments at $254.72 per month. The amount past due was listed as none and Marable's credit rating was listed as "I–2."[14] The report also stated that Marable had never been subject to any foreclosures, garnishments, suits or judgments regarding debts, or bankruptcies. The report also indicated that Marable had not previously rented or owned a home and that before working for the Feather Corporation he had worked for the State of Alabama as a parole officer for

---

**8.** The engagement shortly thereafter broke off and Marable remains single.

**9.** Although Marable stated in his deposition that he placed a deposit to secure the apartment, he admitted at trial that he did not place a deposit.

**10.** Marable testified that Mrs. Sims, at the conclusion of that telephone interview, told him that his credit was "A–OK" or "perfect" but Mrs. Sims testified that she made no such statement to Marable.

**11.** Mrs. Sims testified that she made an effort to contact the Feather Corporation but was unable to locate an address or telephone number. Defendants' own evidence showed that Feather was a duly incorporated Alabama corporation.

**12.** Mrs. Sims confirmed in her testimony that Equifax considered Marable to be reliably employed.

**13.** Marable gave undisputed testimony that the jewelry store account had been timely paid.

**14.** An I–2 rating was the second highest credit rating on a scale of I–1 to I–9. An I–2 rating indicated that Marable had paid an installment at least once in more than 30 days but not more than 60 days, or that he had not more than one installment payment past due. The credit report, however, stated that Marable had no amounts past due on his bank loan account. Defendants did not claim that Marable was behind on his car payments until the trial, when Mrs. Walker claimed that this was another reason she did not rent to Marable.

1½ years. Marable's net worth was estimated at $7,000. The report concluded that there were no factors that might affect doing business with Marable on a credit basis.

Later on the same day that Marable was interviewed by Mrs. Sims from Equifax, he phoned Mrs. Walker who told him that as soon as she received the Equifax report she would contact him. Mrs. Walker testified that Marable accused her of stalling and of not wanting to rent to him because he was black. She testified that until Marable informed her she was unaware that he was black. Mrs. Walker received the report on December 10, 1976, and on that day Marable phoned Mrs. Walker. Marable testified that Mrs. Walker asked him why he wanted to live on that side of town and then laughed at him and told him that she did not rent to unmarried applicants. Mrs. Walker testified that until she received the credit report she was unaware that Marable was single. Later that same day Marable again phoned Mrs. Walker requesting an explanation as to why he was rejected as a tenant. Marable claimed at trial that Mrs. Walker refused to give him any further explanation, but Mrs. Walker testified that she told him that, in addition to his single marital status, he lacked sufficient credit and had no previous rental history, and that his employer and his income could not be verified. She also testified that Marable "got a little smart" with her during the phone call when she told him that he would not get the apartment.

The apartment for which Marable had applied remained vacant for three months, until it was rented to a white single female with no children.

After being refused as a tenant, Marable then went to the United States Department of Housing and Urban Development (HUD) on December 20, 1976, and filed a charge against defendants alleging that they discriminated against him on the basis of his race in refusing to rent to him. Defendants told the HUD investigator that Marable was rejected as a tenant because he had minimal credit references and had never previously rented an apartment. Mrs. Walker did not tell HUD that she had earlier stated that she refused to rent to Marable because of his single marital status. She admitted at trial that she gave other reasons for rejecting Marable because she was not certain that it was legal to refuse to rent to Marable on the ground of single marital status. HUD concluded from its investigation that defendants denied Marable an apartment because of his race.

This suit was filed on May 2, 1977, after efforts at conciliation failed. Defendants have asserted different reasons at different times for rejecting Marable as a tenant. As mentioned above, they told a HUD investigator that Marable's inadequate credit and rental history were the reasons he was rejected. In their answer to the complaint the only asserted reason was Marable's single marital status. In their answers to Marable's first interrogatories, Marable's alleged credit deficiencies were listed as the reason for defendants' refusal to rent to him. At trial, two more reasons were stated: Marable was "a little smart" with Mrs. Walker during one phone call, and he was employed with a "new" company.

The district court found that Marable was denied the apartment because of his single marital status, his credit report and his constant harassment of defendants. The court discounted the testimony of two of Marable's witnesses on the ground that they evidenced clear bias because one of the witnesses was under indictment for stealing from defendants and the other was involved in civil litigation with defendants.[15] The court further stated that "[p]laintiff demonstrated a lack of credibility in his testimony both because of contradictions in his testimony and by his own manner and demeanor in court." The court found that Marable's credit report was unacceptable because he claimed an estimated $14,000

---

15. The court stated that "Mrs. Holtquist" was involved in civil litigation with defendants. The witness was, rather, Leonard Hultquist, who along with his wife was involved in a suit concerning a contract dispute with defendants.

yearly income with a "nonexistent corporation" and he had "no significant employment history." The court concluded that defendants were justified in refusing to rent to Marable solely on the basis of his credit report.

A plaintiff bringing a claim under the Fair Housing Act of 1968, 42 U.S.C.A. § 3601 *et seq.*, charging defendants with refusal to provide housing on the basis of racial discrimination is not required to establish that his denial of housing was motivated *solely* by racial discrimination. *Taylor v. Fletcher Properties, Inc.*, 592 F.2d 244, 247 n.6 (5th Cir. 1979); *Payne v. Bracher*, 582 F.2d 17, 18 (5th Cir. 1978); *Burris v. Wilkins*, 544 F.2d 891 (5th Cir. 1977); *United States v. Pelzer Realty Co., Inc.*, 484 F.2d 438, 443 (5th Cir. 1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). It is sufficient that race was one significant factor considered by the defendants in dealing with the plaintiff. *United States v. Pelzer Realty Co., supra*, 484 F.2d at 443.

Similarly, a plaintiff bringing suit under the Civil Rights Act of 1866, 42 U.S.C.A. §§ 1981, 1982 [16] is not required to show that discrimination was the sole reason for defendants' refusal to provide housing. *Payne v. Bracher, supra*, 582 F.2d at 18; *Gore v. Turner*, 563 F.2d 159, 167 & n.5 (5th Cir. 1977). The race of an applicant for tenancy is not to be considered and the presence of other factors also motivating the refusal to rent cannot justify racial discrimination. *Payne v. Bracher, supra*, 582 F.2d at 18.

The district court's determination that the defendants did not discriminate against Marable is a finding of ultimate fact with respect to which this Court is not bound by the clearly erroneous standard of review. *See Williams v. Tallahassee Motors, Inc.*, 607 F.2d 689, 690 (5th Cir. 1979); *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 314 n.1 (5th Cir. 1977), *cert.*

*denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); *East v. Romine, Inc.*, 518 F.2d 332, 338 (5th Cir. 1975); *Bolton v. Murray Envelope Corp.*, 493 F.2d 191, 195 (5th Cir. 1974); *United States v. Jacksonville Co.*, 451 F.2d 418, 423 (5th Cir. 1971). However, the trial court's credibility determinations and findings of subsidiary fact are reviewed under the clearly erroneous standard. *Williams v. Tallahassee Motors, Inc., supra*, 607 F.2d at 690; Fed.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 1147 (1948); *see United States v. Pelzer Realty Co., Inc., supra*, 484 F.2d at 445–46.

Several of the district court's findings of subsidiary facts are not supported by the record and are clearly erroneous. The finding that Marable claimed an estimated annual salary of $14,000 "with what proved to be a nonexistent corporate employer" was refuted by defendants' own exhibit which consisted of a copy of the article of incorporation of the Feather Corporation. The finding that Marable had "no significant employment history" is belied by Marable's credit report itself, which informed the defendants that he had been working full time for 8½ months and had previously worked as a parole officer for the State of Alabama for 1½ years, and which described his prospects for continued employment as good.

The finding that Marable was denied the apartment because he was single and the Traces had a policy of renting *only* to families and marrieds is contradicted by Mrs. Walker's own testimony that applications were accepted from singles on a case by case basis and that 22 of the total 209 tenants at the Traces had been singles. It

---

**16.** The Fair Housing Act of 1968, 42 U.S.C.A. § 3601 *et seq.*, and 42 U.S.C.A. § 1982 are independent statutory remedies available to black plaintiffs against persons who refuse to rent or sell them property because of their race. *Dillon v. AFBIC Development Corp.*, 597 F.2d 556, 561 (5th Cir. 1979).

is manifest from the documentary evidence and the testimony of Mrs. Walker that apartments were in fact rented to singles, and the exceptions made by defendants constitute over 10% of all the tenants who had ever rented at the Traces.

The finding that one of defendants' reasons for refusing to rent to Marable was because he "constantly harassed" the defendants is without support in the record. Even the testimony of Mark Hammond, the resident manager of the Traces, and that of Mrs. Walker does not warrant a finding that three phone calls to Mrs. Walker and two to Hammond constituted constant harassment. Neither Mrs. Walker nor Hammond claimed that they were "harassed" by Marable. Mrs. Walker testified merely that Marable got "a little smart" during one phone call but her perception that Marable, a young black man, was uppity toward her does not support the court's finding.[17]

The findings of fact mandated by Fed.R. Civ.P. 52(a) "must be sufficient in detail and exactness to indicate the factual basis for the ultimate conclusion reached by the court." *Corley v. Jackson Police Department*, 566 F.2d 994, 1003 (5th Cir. 1978), *quoting Lettsome v. United States*, 434 F.2d 907, 909 (5th Cir. 1970). The district court in this case failed to consider in its findings the evidence indicating that the defendants' credit and employment requirements and their single male exclusionary policy were unequally applied as between Marable and white applicants. The court also failed to consider whether defendants' rejection of Marable's application for tenancy was a pretext for racial discrimination.

■ Marable introduced documentary evidence consisting of applications for tenancy listing credit references and credit reports prepared by a credit agency, which demonstrated that defendants rented to numerous white persons with significant credit problems far greater than any deficiencies indicated by Marable's credit report.[18] Similarly, the undisputed evidence indicated that defendants had rented to (1) numerous tenants with unverified incomes, (2) several who were unemployed or who worked for companies with which the defendants were unfamiliar when they were accepted as tenants, and (3) several others for whom defendants ordered no independent credit report to be prepared. Also, by defendants' own admission in the testimony of Mrs. Walker, at least 10 single white males had rented at the Traces. The defendants' disparate treatment of white applicants and Marable, as reflected by their patterns of accepting white applicants who were credit risks or who were single, is clearly reflected by the evidence.

■ The district court also erred in failing to make any finding concerning whether the defendants' asserted reasons for refusing to rent to Marable were a pretext for racial discrimination. The asserted reasons given by defendants have included virtually every possible reason except Marable's race. They have asserted, alternatively or cumulatively, at different times during this dispute, that the reasons for Marable's rejection were his poor credit, his unverified income and unverified employer, his "smartness," and his single marital status. The district court erred in failing to consider the comparative evidence of the unequal application of defendants' rental criteria as between Marable and white applicants, which demonstrated that defendants' reasons for rejecting Marable were a pretext. *Cf. Corley v. Jackson Police Department*, 566 F.2d 994, 999–1000 (5th Cir.

---

17. This alleged "smartness" occurred *after* Marable was informed that he was not an acceptable tenant and after he suggested that his race was the reason for his rejection. The smartness was first mentioned as a reason for rejection at trial; it was not mentioned in defendants' statement to HUD, their answer to the complaint, their depositions, or their answers to interrogatories. Marable's so-called smartness, as alleged by Mrs. Walker at trial, has been described in defendants' appellate brief as Marable's "very belligerent," "abusive," and "obnoxious" phone conversation.

18. Even though many of the tenants whose credit histories were far worse than Marable's had been allowed to rent apartments prior to the time Francis Walker became personally involved in management of the Traces Apartments, Mrs. Walker has had an ownership interest in the Traces complex since its inception.

1978) (remand for new trial because district court erred in failing to address evidence that employer failed to apply the same criterion to other employees and that employer's reason for discharge of plaintiffs was a pretext for discrimination), *aff'd after remand*, 639 F.2d 1296 (1981). The district court never considered the qualifications of Marable in relation to the qualifications of white applicants; rather, it considered Marable's qualifications only against the defendants' alleged absolute standards. However, even Mrs. Walker testified that the defendants' rental standards were not absolute and that tenants' applications were considered on a case by case basis.[19] The defendants' tenant selection process and criteria were shown by the testimony of Mrs. Walker and Mark Hammond to be subjective. Finally, the defendants admitted that no black applicants had ever been accepted as tenants at the Traces Apartments.[20]

The district court discounted the testimony of Marable on the ground that it lacked credibility because of contradiction and Marable's demeanor at trial. The court also discounted the testimony of two of Marable's witnesses on the ground that they were biased.[21] Even if it is accepted as true that Marable and two of his witnesses lacked credibility—a district court finding that is binding on this Court unless it is clearly erroneous—documentary evidence in the record clearly indicates that Marable's race was a significant factor in his rejection as a tenant. A district court may not "bootstrap" its findings and conclusions by stating that they are based upon credibility when the documentary evidence and undisputed testimony reflected in the record show the findings and conclusions to be clearly erroneous.

We conclude, after careful examination of the record, that the unequal application of defendants' rental criteria, including marital status and employment and credit histories, as between Marable and white applicants demonstrates disparate treatment on the basis of race violating the Fair Housing Act, 42 U.S.C.A. § 3604, and 42 U.S.C.A. §§ 1981 and 1982. For this reason we do not discuss Marable's contention that defendants' single male exclusionary policy violates the Fair Housing Act on the basis of sex discrimination.

Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for consideration of damages, attorney's fees, and injunctive relief.

---

**19.** Mrs. Walker testified that she gave potential tenants the benefit of the doubt in considering their applications. Also defendants' appellate brief states that they were "selective and discreet" in making exceptions to their policy of not renting to singles.

**20.** Other housing discrimination cases have found this to be a significant evidentiary factor. *E. g., United States v. Reddoch*, 467 F.2d 897, 899 (5th Cir. 1972); *United States v. West Peachtree Tenth Corporation*, 437 F.2d 221 (5th Cir. 1971).

**21.** One of the witnesses, Jean Sharp, a former resident manager at the Traces Apartments, testified that she was instructed by Mrs. Walker to refer all applications from black applicants to her if Ms. Sharp could not "handle it." Ms. Sharp also testified that Mrs. Walker told her that Mr. Walker "would just die" if she rented to a black applicant at the Traces Apartments.