**Julius Herman BROWN, Thomas L. Hanson, Henry J. Matthews, Mrs. Florence Sorrells, Troy Pierce, Jr.**

v.

**STATE REALTY COMPANY, Carl J. Furstnow, Mrs. Carl J. Furstnow, Margaret Holly, William Bloodworth.**

Civ. A. No. 12943.

United States District Court
N. D. Georgia,
Atlanta Division.

Sept. 2, 1969.

A. James Elliott, Archer D. Smith, III, Atlanta, Ga., David Crosland, for plaintiffs.

Hoke Smith, H. A. Stephens, Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., for defendants.

SIDNEY O. SMITH, Jr., Chief District Judge.

This is an alleged "blockbusting" case brought by the plaintiffs as private citizens under the provisions of 42 U.S.C.A. § 3612. The plaintiffs seek injunctive relief and damages against the defendants who, it is contended, have violated 42 U.S.C.A. § 3604(e) which renders it unlawful:

"For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, or national origin."

The injunctive feature of the case came on for hearing before the court at which time the defendants filed their motion to dismiss. Subject to said motion, evidence was presented on which the court makes the following

## FINDINGS OF FACT

The plaintiffs are all present or former residents of Connie Lane, a single-family residential street in DeKalb County in suburban greater Atlanta, on which are located homes ranging in value from $15,000 to $25,000.

The defendant Mrs. Carl J. Furstnow is the sole proprietor of a licensed real estate agency operated under the trade name "State Realty Company." The defendants Carl J. Furstnow, Margaret Holly, and William Bloodworth are duly licensed solicitors or salesmen for Mrs. Furstnow as employees of "State Realty Company." In addition, Mrs. Furstnow is the owner of a single-family rental dwelling also located on Connie Lane.

Early in 1969 in this previously all-white neighborhood a dwelling located on Kehelay Drive at its intersection with the end of Connie Lane was purchased by a Negro. News of this purchase quickly spread throughout the area and precipitated much dialogue among the residents of Connie Lane. As a result, in January and early February several of the residents on the block listed their homes for sale: Hanson and Mrs. Sorrells with Alexander Realty Co.; a Mrs. Walker with State Realty; and Pierce with Berry Realty. "For Sale" signs appeared at several of these locations but no homes sold during January or February.

In late January, Mrs. Holly on behalf of State Realty telephoned Mrs. Matthews and asked for a listing of the Matthews' home. In the call she stated that the neighborhood "was going colored and she might as well face it." Mrs. Matthews deferred to her husband and in a similar call to him, Mrs. Holly stated that the area would be "all occupied by colored." Subsequently, Mr. Bloodworth, on behalf of State Realty, came to the home seeking a listing and stated that

the "neighborhood was going colored." The Matthews refused a listing.

In February, Mrs. Furstnow secured a Negro purchaser, Robinson, for the Walker house after agreeing to take a "trade-in" of his former home. However, on February 21st, apparently upon learning the facts, Mrs. Walker refused to execute the sales contract and tore it up. Meanwhile, Mrs. Holly contacted Mrs. Sorrells and asked to co-op on the sale of her home with Alexander Realty. In the conversation, she stated she had a ready buyer and that State Realty already had a contract with Mrs. Walker for a sale to a colored and the neighborhood "would go colored." Mrs. Sorrells refused.

On March 2nd, Mrs. Furstnow agreed to sell her own Connie Lane property to the Negro purchaser, Robinson, subject to certain loan commitments. Immediately a State Realty "SOLD" sign was erected on the property. Due to loan and tenant and other complications this contract was cancelled on March 28th.

The appearance of the "SOLD" sign created a new wave of conversations in the community. Inquiries were made in the neighborhood and Pierce called Mrs. Furstnow and was informed that she had "sold to a colored." This information was immediately disseminated to the other residents. Pierce then asked State to sell his home and in the negotiations with Mrs. Furstnow, Holly, and Bloodworth he was told that the area was "going colored" and "this was the best time to sell." Mrs. Furstnow also advised him she did not wish to pressure a listing. In apparent panic after the appearance of the "SOLD" sign, Pierce listed his home with State on March 10 and it was sold to a Negro purchaser on March 12. In the sale, Pierce received his full asking price for the property and has since purchased "farther out."

About this time, Mrs. Furstnow, Bloodworth and Holly all went to the Matthews home to try again to obtain a listing. In the conference, Mrs. Furstnow informed them of the Pierce listing and reiterated that the neighborhood was "going colored." Upon being accused by Matthews that real estate people "made a racket out of Negroes," she replied that she made money out of selling to them and had "had a ball in the East Lake area," another transitional neighborhood in suburban Atlanta. Again, the listing was refused.

About the same time, Bloodworth went to the J. H. Brown house and asked for a listing on behalf of State Realty. In the conversation, he stated that the house on the corner had been sold to Negroes and that he had a ready buyer for the Brown house. Mr. Brown asked if he dealt with whites and he responded that most of his dealings were with Negroes and he was making money out of it. He came back twice later, but the listing was refused.

In spite of the cancellation of the sale of the Furstnow house to Robinson, the "SOLD" sign remained on the property until late May or early June, during which period the house was shown to several Negro prospects. In late spring, Hanson asked Mr. Furstnow about the sale of the house and was told it was in fact sold. Shortly thereafter, the "SOLD" sign was replaced with a "FOR SALE" sign which remains until this time.

Mainly on the efforts of the plaintiffs herein, the block has now "stabilized" and the residents have withdrawn their listings with the various real estate agents. No houses are now advertised for sale except for the Furstnow house and no sales have occurred to white or Negro purchasers since March.

None of the plaintiffs have suffered any actual damages, in that none except Pierce, sold their property. While Pierce purchased a more expensive house and his loan payments increased, the evidence is undisputed that he received his full asking price for his Connie Lane property. The Pierce sale and all proposed listings, were subject to the standard 6% sales commission in favor of State Realty. State Realty did not buy or offer to buy any property outright.

## CONCLUSIONS OF LAW

■ In support of the motion to dismiss, defendants introduced evidence (EX 1–4) which established that none of the properties of the plaintiffs were financed on loans insured by the credit of the Federal Government under 42 U.S.C.A. § 3603(a) (1). Beyond that, the defendants insist that there is no jurisdiction in the court under 42 U.S. C.A. § 3603(a) (2) for the reason that no constitutional basis exists for the federal control of the sale and disposition of private property, and specifically that such activities are not within the sphere of interstate commerce, but are reserved to the states under the Tenth Amendment. In support, the defendants rely upon such ancient authorities as United States v. Fox, 94 U.S. 315, 24 L.Ed. 192 (1876) and upon the now-rejected restrictive rationale of A.L.A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947 (1935) and United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914 (1936). To the extent that such authorities negate any federal jurisdiction over intrastate commerce, they are accepted.

■ There is no evidence that the activities proscribed herein are in interstate commerce and the court so finds. Thus, any claim of jurisdiction on such grounds must fail. Cf. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

■ Plaintiffs also contend that Section 5 of the Fourteenth Amendment, which provides: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article" is no longer limited to state action within the historical sense of the Fourteenth Amendment, but that such provision gives the Congress unlimited authority to enact legislation restricting individuals from any activity which might affect a state's ability to perform its Fourteenth Amendment obligations. Stated another way, the argument is advanced that under Section 5 private and individual action may be regulated if it even remotely constitutes an impediment to equal protection and due process rights guaranteed the citizens of every state under the Fourteenth Amendment. Such in effect is the thrust of Justice Brennan's dissent in United States v. Guest, 383 U.S. 745, at 774–786, 86 S.Ct. 1170, at 1176, 16 L.Ed.2d 239 (1966). However, in the court's view, the majority did not so hold. In fact, the court reiterated the classic concept thusly:

It is a commonplace that rights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority. The Equal Protection Clause "does not * * * add any thing to the rights which one citizen has under the Constitution against another." United States v. Cruikshank, 92 U.S. 542, 554–555, [23 L.Ed. 588]. As Mr. Justice Douglas more recently put it, "The Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals." United States v. Williams, 341 U.S. 70, 92, [71 S.Ct. 581, 593, 95 L.Ed. 758] (dissenting opinion). This has been the view of the Court from the beginning. United States v. Cruikshank, supra; United States v. Harris, 106 U.S. 629; [1 S.Ct. 601, 27 L.Ed. 290]; Civil Rights Cases, 109 U.S. 3, [3 S.Ct. 18, 27 L.Ed. 835]; Hodges v. United States, 203 U.S. 1, [27 S.Ct. 6, 51 L.Ed. 65]; United States v. Powell, 212 U.S. 564, [29 S.Ct. 690, 53 L.Ed. 653]. It remains the Court's view today. See, e. g., Evans v. Newton, 382 U.S. 296, [86 S.Ct. 486, 15 L.Ed.2d 373]; United States v. Price, 383 U.S. 787, [86 S.Ct. 1152, 16 L.Ed.2d 267].

The court went on to find state involvement in portions of the indictment and federal rights under interstate commerce in other portions. In the companion case of United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), the court found that the

defendants acted "under color of state law" and in conspiracy with state officials. In Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), a clear Fourteenth Amendment right and state action by voting laws was involved. Thus, none of these authorities is persuasive to the court that the sale and disposition of private property is properly subject to control under Section 5 of the Fourteenth Amendment. To the contrary, while this new theory of constitutional law may yet become the guide, the present tests still seem to be that the prohibited activity must relate to an independent federal constitutional right or to a Fourteenth Amendment right inhibited by state action, either direct or indirect. *E. g.*, Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). There being no evidence whatever of state involvement in the acts of the defendants, jurisdiction would likewise fail on these grounds.

■ However, in the absence of interstate commerce power and Fourteenth Amendment considerations as a basis for jurisdiction, there remains the Thirteenth Amendment as interpreted in the recent case of Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Any doubts as to the legality of housing laws generally are disspelled by the court's discussion in the opinion of the effect of 42 U.S.C.A. § 1982, which provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Conceding that the case presented a question of first impression, the court unequivocally holds that § 1982 "bars *all* racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment."

at 413, 88 S.Ct. at 2188. While the opinion disavows the result, it seems to constitute a pre-approval of the Fair Housing Title of the Civil Rights Act of 1968, of which the "blockbusting" provision is a part. There remains only a consideration of whether the provision is itself a rational means of effectuating the stated policy of the legislation "to provide, within constitutional limitations, for fair housing throughout the United States." In this respect, the determination of the Congress is binding if there is any reasonable basis for the action and the burden would rest upon the defendants to show otherwise. See Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (power under interstate commerce); Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (power under Fourteenth Amendment); South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (power under 15th Amendment) and, here, Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (power under 13th Amendment). No such showing is made. To the contrary, it is recognized that the practices condemned by the provision impede the rights granted in § 1982 and constitute a fundamental element in the perpetuation of segregated neighborhoods, racial ghettos and the concomitant evils which have been universally recognized to emanate therefrom. Such iniquitous conduct, trafficking as it does on the fears of whites and the desperation of Negroes, clearly affects equality in housing and is abhorred by all citizens, regardless of their personal views on the racial question.

■ It is thus concluded that a federal question is present and jursidiction exists under 28 U.S.C.A. § 1331(a), the $10,000 amount in such cases having been expressly waived by the Congress at 42 U.S.C.A. § 3612(a).

Accordingly, the motion to dismiss is denied.

■ As to the facts, the evidence falls short of the classic case of inordinate

profiteering by the purchase at low prices from whites and the resale at high prices to incoming Negroes. The truth is that here the "block" was not "busted", due to the common-sense attitude of the remaining residents. However, the statute does not proscribe against successful efforts alone but equates any "attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, or national origin" with a successful inducement to do so. In such context, the acts of the defendants constitute such attempts. This conclusion is not refuted by the failure to realize an actual profit in those instances where no sale was consummated. The prospect of commissions is inherent in every listing. Nor does the fact that contact with the agents was initiated in some cases by the property owners or that the subject of Negro purchasers was in some cases first raised by the property owners change the result. The conduct condemned and the responsibility placed by the statute on the agent is to refrain absolutely from any such representations. Under the facts as determined by the court the defendants [1] failed in this respect. In a determination of credibility, it is found that the statements were actually made and the only motivation discoverable from the facts would be the inducement to list and sell with the consequent commission profit to defendants. Alone, even though no actual damage occurred, these statements support the claim for relief on the part of the plaintiffs.

Accordingly, an appropriate injunction may issue under Rule 65.

It is so ordered.

[1]. The court finds no evidence to support the claims that defendant, Carl J. Furstnow, made any such representations, but finds that each of the other defendants did so. In view of the relationship between him and his employer, the matter is of little import on the matter of injunctive relief. It would be significant on the outstanding claims for damages.

In view of the finding that no actual damages accrued to the plaintiffs, it is suggested that the parties consider submission of the question of punitive damages under 42 U.S.C.A. § 3612(c) to the court by brief, so that a final order may issue.