**UNITED STATES of America**

v.

**Leon SAROFF, d/b/a Saroff Real Estate Company.**

**Civ. A. No. 8445.**

United States District Court,
E. D. Tennessee, N. D.

May 9, 1974.

As Amended July 10, 1974.

John L. Bowers, Jr., U. S. Atty., Knoxville, Tenn., Elliott D. McCarty, Housing Section, Civil Rights Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Robert H. Watson, Jr., Joseph J. Levitt, Jr., Knoxville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

### INTRODUCTION

The United States instituted this action on November 8, 1973 against three defendants: Saroff Real Estate Company, Simco Properties, Inc. and M and W Enterprises, Inc., alleging that they had individually and collectively violated certain provisions of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq. (The Fair Housing Act of 1968 [hereinafter referred to as the Act]). Each defendant operates a realty business with operations in East Knoxville, Tennessee. The Court entered consent orders as to M and W Enterprises, Inc. on November 8, 1973 and February 8, 1974, respectively, in which the defendants agreed to comply with the Act in full.

Pursuant to 42 U.S.C. § 3613,[1] the United States alleges that the remaining

---

1. 42 U.S.C. § 3613 provides in full that:

"Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, or that any group of persons has been denied any of the rights granted by

defendant, Saroff Real Estate Company, has engaged, either as an individual or as a member of a group, in certain discriminatory conduct prohibited under 42 U.S.C. § 3604(a), (b), (d) and (e), which provides:

" § 3604

". . . it shall be unlawful—

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale of rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin.

"(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion or national origin.

\* \* \* \* \* \*

"(d) To represent to any person because of race, color, religion, or national origin that any dwelling is not available for inspection, sale or rental when such dwelling is in fact so available.

"(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, or national origin."

The phenomena described in the above section are more commonly referred to as blockbusting and steering.

The trial of this case lasted one and a half days, during which time thirty exhibits were introduced and testimony received from thirty-three witnesses, twenty-eight on behalf of the Government and five on behalf of Saroff. It is in this posture that the Court sets forth the following findings of fact and conclusions of law pursuant to Rule 50, F. R.Civ.P.

## FINDINGS OF FACT

The defendant, Saroff Real Estate Co., Inc., is engaged in the sale and rental of real estate, both residential and acreage property,[2] in Knoxville and Knox County, and has two offices—one in East Knoxville (Magnolia Avenue) and one in West Knoxville (Kingston Pike). Since its initial development in 1964, the major portion of Saroff's business has been conducted in the East Knoxville area,[3] a portion of which is presently a "transitional" area that has experienced an influx of Black homeowners and a concomitant outflow of White homeowners beginning around 1969. Three other realtors also operated in this area of Knoxville—Frank Wylie Realty Company, Simco Realty, and Jim Miller Realty—although they have not traditionally concentrated in the East Knoxville market. During the time period under examination here, Saroff employed six real estate agents who were active[4] either on a full or part-time basis: Mr. Louis Jaffe, who was also a broker; Mrs. Charles Kelley; Mrs. Stanley Williams; Mr. Monte Millen; Mr. Joe Levitt, Sr.; and Mr. Madison Smith.

Knoxville has undergone in recent years two phases of a continuing urban renewal project, the Mountain View Urban Renewal Project, and, more recently,

---

this subchapter and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this subchapter." For a general description of the Act see 13 A.L.R.Fed. 285; Comment, 22 De Paul L.Rev. at 823 (1973).

2. Defendant's rural and acreage-only transactions are not under examination here.

3. Prior to his real estate operations, Mr. Saroff operated a pawn shop in a predominantly Black sector of Knoxville.

4. Other individuals, who had previously worked for Saroff, were considered inactive.

the Morningside Urban Renewal Project, which was first formally begun on June 31, 1971. At that time, the Knoxville Housing Authority (K.H.A.) was faced with the formidable task of finding new homes for the numerous persons that would be displaced in the course of the renewal project. (See Exhibit 19) In order to effect an efficient and orderly relocation of residents from the project area to other areas of the City, a meeting was held on June 17, 1971 by K.H.A. and was attended by 25–30 local real estate agents, including agents from Saroff, Miller, Simco (then Simpson), and Wylie. (Exhibit 9) At this meeting, K.H.A. explained that the families to be displaced by the program would need replacement housing and that the realtors' assistance in this relocation program would be instrumental to the project's success. In this regard, the Housing Authority explained to the agents and brokers the applicable federal relocation laws, that K.H.A. would have to inspect and approve any replacement listings for building code compliance before it would authorize a replacement sale to a displacee, and, lastly, the displacement price schedule (Exhibit 10) was explained.[5] Mr. Ulmer, Director of the Urban Renewal Program, testified that at this meeting K.H.A. requested the realtors to submit listings to the Housing Authority so that it could inspect and approve the same for displacees. Saroff, thereafter, submitted listings to K.H.A. from August 1971 to December 1973 (Exhibit 13). Mr. Ulmer also testified that most of the listings his office received from the realtors were in the East Knoxville area, adjacent to the project area and, for the most part, in previously White neighborhoods.[6] When asked on cross-examination whether his office received complaints from Black displacees that the requested listings were restricted to the East Knoxville area, Mr. Ulmer responded, "No," but indicated instead that K.H.A.'s principal problem in the relocation project was not being able to relocate displacees fast enough. Thus, it appears that some of the initial relocation of urban renewal displacees was carried out in an atmosphere of urgency. Mr. Ulmer testified that a shortage of suitable housing in all Black neighborhoods forced displacees to seek replacement housing in previously White neighborhoods.

The record indicates that shortly after the June 17 meeting an appreciable increase in the number of houses for sale in the East Knoxville area occurred. In particular, this increase was noted on Michael Street, Meadowview Drive, Woodbine Avenue and Fifth Avenue—streets lying northeast and essentially adjacent to the Morningside project area. Although "For Sale" signs bore the names of Saroff, Wylie, Miller and Simco, Mr. Saroff testified that his company had listings and "For Sale" signs in the area before the meeting since his company had operated in the East Knoxville area prior to June 1971.

The Court concludes that the East Knoxville area adjacent to the Morningside Urban Renewal Project area (Exhibit 19), consisting in the main of Jefferson Avenue, Woodbine Avenue, Fifth Avenue, Magnolia Avenue, and southeasterly to Selma Avenue, was a racially transitional area during the period under examination here, 1969–1973. Thus, during this period there was an influx of Black homeowners, in part, displacees from the Morningside Urban Renewal Project, into the adjoining East Knoxville area and an accompanying outflow of White homeowners from the same geographical area (Exhibits 1, 2, 3, 4, and 19).

The Government's principal witnesses consisted of various real estate agents

---

5. Evidently, the Exhibit 10 schedule was not effective until May 1972.

6. The term "all White" is cautiously avoided since testimony from homeowners in the East Knoxville area indicated that a relatively small number of Blacks moved into the East Knoxville area as early as 1969, before the Morningside Urban Renewal Project formally commenced in June of 1972.

and persons who were either homeowners in the East Knoxville area prior to the influx of Blacks or who had sought to buy a home and used the services of Saroff, Miller, Wylie or Simco. The significance of this testimony justifies its summation at this point:

a. *Mrs. Bella Gambrell*—White, a resident of the East Knoxville area, testified that, although she could not identify the person specifically, a sales woman from Saroff approached her at her home in East Knoxville in 1971 and purportedly made the statement that "the coloreds are moving in [the neighborhood]."

b. *Mrs. Betty Byrd*—White—who presently lives in West Knoxville, testified that the real estate activity in her prior East Knoxville neighborhood started to increase appreciably in 1971. After having contracted with a realtor to list her former home, she testified that she was contacted in January 1972 by Mrs. Kelley of Saroff, who asked her if she could list her house. Mrs. Byrd told her that they had already listed the house with another realtor, Claiborne, Lothrop and Sample, Inc. Approximately three months later, Mrs. Kelley arrived at Mrs. Byrd's home and said she had a prospective Black buyer in her car who was interested in looking at her home. Mrs. Byrd again told Mrs. Kelley to contact a Claiborne agent. On cross-examination, Mrs. Byrd testified that Kelley's statement that she had a prospective Black buyer had no immediate effect on her at the time of Mrs. Kelley's second visit. Mrs. Kelley subsequently testified that she did not recall a second meeting with Mrs. Byrd.

c. *Mrs. Charles McAmis*—White—who has lived on Meadowview Drive in East Knoxville for fourteen years, stated that the first Blacks moved into her neighborhood around 1968–1969 and that real estate activity increased around 1970. In 1971, she stated she was contacted by Mrs. Baxter from Simpson Realty and later was contacted in the Fall of 1971 by an agent from Wood Agency, who stated to Mrs. McAmis that, "[i]f you ever want to sell your home, contact me. . . ." Mrs. McAmis was never contacted by a Saroff agent.

d. *Mr. James M. Baker*—White—who has lived in the East Knoxville area for five years, testified that he was contacted by Mrs. Williams of Saroff by telephone at his place of business sometime before June 1973. At that time, Mrs. Williams said that she had a prospective buyer who was interested in purchasing Mr. Baker's home. There appears to be a question whether Mrs. Williams told Mr. Baker that the buyer was Black in response to an inquiry made by Mr. Baker or whether Mrs. Williams said in the first instance that the interested buyer was Black. Mr. Baker did testify on cross-examination that any conversation about race was broached by him and not Mrs. Williams.

e. *Mrs. Gary Coffey*—White—who had lived in East Knoxville for nine years stated that the first Blacks moved into her neighborhood three years ago and that her next door neighbor, a Black family, had moved in two years ago. In the Fall of 1972 Mrs. Coffey stated she was contacted by Mrs. Kelley, a distant blood relative, who asked Mrs. Coffey at that time whether she had met her next door neighbors, the Davis', a Black family that had recently moved into the neighborhood.

f. *Mr. Coffey*—White—testified that when Mrs. Kelley indicated on a second visit that she had a prospective buyer he could not recall whether she said the buyer was Black. Mr. Coffey said it was "common knowledge" that the buyers were Black.

g. *Mr. David Qualls*—White—who has lived at his present East Knoxville address for 8½ years, testified that Mrs. Kelley came to his house in the early part of 1972 and said she had a prospective buyer from Racula Village, a Black neighborhood. When asked by Mr. Qualls if the interested buyer was Black, Mrs. Kelley answered, "Yes."

h. *Mrs. Hood*—White—an East Knoxville resident for five years, was contacted by Mrs. Kelley in the summer of 1973, who came to Mrs. Hood's home and said she had an interested buyer. Mrs. Hood stated that at the time of Mrs. Kelley's visit, there existed a climate of anxiety and consternation in the neighborhood due to an increase in the number of "For Sale" signs. There appeared to be some difference whether Mrs. Kelley said the prospective buyer was Black before or after an inquiry by Mrs. Hood respecting the buyer. Mrs. Hood said the house was not for sale and Mrs. Kelley left.

i. *Mr. Harold Beard*—White—testified that in the summer of 1969 he phoned Saroff and inquired about a house in the Holston Heights area of East Knoxville (at that time predominantly White, but in a state of transition). Mr. Beard testified that an agent at Saroff told him that he would be more comfortable in West Knoxville. This statement, however, was made to Mr. Beard without knowledge of his race. Mr. Beard testified that the Saroff agent asked about his occupation only.

j. *Mrs. Carolyn Davis*—Black—testified that she contacted Saroff in late 1970–1971 by phone and spoke to Mr. Joe Levitt, Sr.[7] At that time, she told Mr. Levitt that she was looking for a three-bedroom home in the $12,000–$14,000 price range. Mr. Levitt showed her three homes in the East Knoxville area. Thereafter, when her husband accepted a job in Oak Ridge, located west of Knoxville, she again requested some listings from Saroff in the $15,000–$20,000 price range for a three-bedroom home. But this time she specifically asked for a location in West Knoxville. A Saroff agent said that houses were high in West Knoxville but that they had listings in her price range in East Knoxville. Mrs. Davis, in the belief that she was being denied listings in the West, then reported her second conversation with Saroff to Mrs. Wilma Dunaway, of the Knoxville Urban League.

k. *Mrs. Dunaway*—White—testified that in response to Mrs. Davis' complaint she phoned Saroff on October 5, 1972 and inquired about three-bedroom houses in the $17,000–$20,000 price range. Mr. Levitt said he had a house in West Knoxville on Tranquilla Lane, one in North Knoxville, and finally told her of the company's listings in East Knoxville. Mr. Saroff later testified that it₀ was his belief when he spoke with Mrs. Davis that she could not have purchased the house on Tranquilla Lane because that particular house did not meet the requisite structural standards for a Federal home loan.

l. *Mrs. Cathy Dunsmore*—White—who previously lived in the East Knoxville area, testified that Mrs. Kelley came to her place of business some time before July 1973 and, after asking Mrs. Dunsmore if she knew that the house next door to her was for sale, said that she had a prospective buyer. In response to a question by Mrs. Dunsmore, Mrs. Kelley said she "wasn't showing anything in that area except to colored people." Mrs. Kelley later testified that she made no remarks to Mrs. Dunsmore regarding race.

m. *Mrs. Glen*—White—contacted a Saroff agent in July 1971 and said she wanted to live in an integrated neighborhood, specifically, the Holston Hills[8] area. Although an agent showed Mrs. Glen a house in the Holston Hills area, the agent purportedly made the statement to her that Blacks were still "east of Sunset."

n. *Mr. Louis Thompson*—Black—testified that he contacted the Wylie Company in July 1970 and inquired about listings in the West Knoxville area. He said he was neither shown nor told of any housing in the West Knoxville area.

7. Mr. Joe Levitt, Sr., seriously ill and unable to testify at the trial, has since passed away.

8. The Holston Hills area is predominantly White, while the Holston Heights area is transitional.

o. *Mrs. Belle Higgins*—White—Executive Vice President of the Knoxville Board of Realtors, testified that Wylie was a member of the Multiple Listing Service but stated that Saroff was not a member.[9]

p. *Mr. Jack King*—White—a previous resident of the East Knoxville area, testified that he contacted the Simpson Company in 1972 and spoke with Mrs. Baxter who stated that she was in a better position to sell a home since she was in touch with the Urban Renewal people and displacees. Mr. King had no contact with Saroff.

q. *Mrs. Anita Washington*—of the Knoxville Community Development Association, testified that she was in charge of the Urban Renewal Relocation program and that Saroff enjoyed a good reputation for honesty and fairness with respect to relocating displacees.

r. *Mr. Charles Ogle*—White—a previous resident of East Knoxville, testified that Jim Miller of Miller Real Estate Co. approached him at his home and said the racial composition of the neighborhood was going to change. Mr. Ogle additionally testified that Saroff later sold his house but made no racial representations at that time.

s. *Mrs. Rachel Jordan*—White—who lived in East Knoxville for fifteen years, testified that a sales person from Simpson came and told her that the neighborhood was going Black; however, no agent from Saroff ever approached her.

t. *Mrs. Stanley Williams*—White—a full-time employee of Saroff, testified that a meeting of Saroff agents was held at Mr. Saroff's home approximately one year ago, at which time Mr. Saroff discussed how to increase the company's listing. Mrs. Williams testified that door-to-door soliciting was neither advocated nor discussed by Mr. Saroff.

u. *Mrs. Bea Tapley*—White—formerly an employee of Wylie, testified that she went to East Knoxville to solicit homes. In particular, Mrs. Tapley testified that she would knock on doors and then urge the occupant that it was an opportune time to sell because of the Urban Renewal program. It is significant to note that Mrs. Tapley testified that most displacees wanted to remain in the East Knoxville area and that the Housing Authority in assisting in the relocation never requested displacement housing outside the East Knoxville area.

Defendant Saroff introduced testimony from its agents—Mrs. Kelley, Mr. Bush, Mr. Madison Smith and its owner, Mr. Saroff.

a. *Mrs. Kelley*—White—generally sought to rebut much of plaintiff's testimony. She contended that her only uninvited contacts were pursuant to requests made by buyers that she inquire about the availability of a particular house. She testified that she had neither sold a house on a racial basis nor did she condone the practice.

b. *Mr. George Bush*—White—who presently owns his own real estate company in Knoxville, testified that when he was formerly with Saroff as an agent and broker for 5½ years he never solicited over the telephone or on a door-to-door basis. Again, Mr. Bush emphasized that most of Saroff's business during his association with the company was concentrated in East Knoxville. When asked on cross-examination if Mr. Saroff had ever specifically instructed him regarding the Fair Housing Act and its mandatory provision, Mr. Bush responded that, while Mr. Saroff had never specifically instructed him about the Act, he did testify that Mr.

9. A multiple listing service is "a system of listing all properties for sale or rent by each real estate with a central bureau or on a list available to all brokers participating who may then sell or rent the properties with the commission being split in agreed proportion between the brokers listing the properties and the brokers selling them." Webster's Third International Dictionary, 1961 Ed. The listing itself is restricted to members. See Collective Exhibit 17.

Saroff had instructed his agents at meetings to be "fair" in showing listings.

c. *Mr. Madison Smith*—Black- a salesman with Saroff for 12–13 years and the second Black salesman in Knoxville to work for a White realtor, testified that his experience in the Urban Renewal Project was that most displacees desired to remain in the East Knoxville area. Additionally, Mr. Smith noted that there was no comparable housing for displacees in any other part of Knoxville.

d. *Mr. Saroff*—testified that most of his customers were Black when he began his operation in 1964; that they have remained predominantly Black; that since 1968 most of his listings have been in East Knoxville; and, that as a result of selling homes to Blacks he has not been able to obtain listings in West Knoxville. When asked how he determined what listings are given a client, he testified that the client's geographical desire and income were controlling. Finally, Mr. Saroff testified that the Housing Authority had advised him that most displacees wanted to live in East Knoxville.

## CONCLUSIONS OF LAW

Jurisdiction of this action is based on 28 U.S.C. § 1345 and 42 U.S.C. § 3613.

The Fair Housing Act, whose stated congressional policy[10] is to provide for fair housing throughout the United States, is of relatively recent origin and, consequently, the Court is not significantly aided by prior case law in its construction of the Act. Moreover, the Act is not without terms subject to varying judicial interpretations and construction.

### Section 3604(e)

■ The Court must initially determine whether defendant's conduct, either as an individual or as a member of a group, was in violation of Section 3604(e), which provides that it is unlawful "[f]or profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, or national origin." Assuming that defendant's actions did in fact satisfy the requisite elements for a violation of Section 3604(e), the Court must then determine whether defendant's actions, when examined collectively, amounted to a pattern or practice under Section 3613. The test for any violation under the Act, therefore, appears twofold.

A representation under Section 3604(e) must be interpreted in light of its purpose: "to prevent persons from preying on the fears of property owners and inducing panic selling resulting in monetary loss to the sellers and instability in the neighborhoods involved." United States v. Mitchell, 327 F.Supp. 476, 479 (N.D.Ga.1971). Thus, the section seeks to discourage an agent's solicitous conduct that serves as a dangerous catalyst in an apprehensive neighborhood. It is not, however, every act of the real estate agent that the Act forbids. Rather, the Act proscribes only those acts or words that would be likely to "convey to a reasonable man, under the circumstances, the idea that members of a particular race, color, religion or national origin are or may be entering his neighborhood." 327 F.Supp. at 479.[11]

■ Accordingly, it would be inadvisable and inequitable for any judicial analysis of defendant's conduct in this instance to be made in a vacuum. Indeed, inherent in the definition set forth in *Mitchell* is the principle that the representation must be construed in light of the surrounding circumstances and the

10. 42 U.S.C. § 3601.

11. *See also* United States v. Bob Lawrence Realty, Inc., 327 F.Supp. 487, 489 (N.D.Ga. 1971), affirmed, 474 F.2d 115 (5th Cir. 1973).

realities of the market place. This standard, therefore, avoids placing an onerous and unjustified burden on the realtor,[12] while preserving the integrity of the new Act's objectives. In this regard, plaintiff urges this Court to adopt the ruling of the district court in Brown v. State Realty Co., 304 F.Supp. 1236, 1241 (N.D.Ga.1969), that any statement regarding a prospective buyer's race is *per se* violative of Section 3604(e). In finding that defendant had made representations in violation of Section 3604(e), the Court in *Brown* submitted:

"Nor does the fact that contact with the agents was initiated in some cases by the property owners or that the subject of Negro purchasers was in some cases first raised by the property owners change the result. The conduct condemned and the responsibility placed by the statute on the agent is to refrain absolutely from any such representations . . ."[13]

304 F.Supp. at 1241.

▆ As the language of Section 3604(e) requires the racial representation to be made for the purpose of inducing the homeowner to sell, the Court is persuaded that an agent's good faith response to an inquiry made by the homeowner regarding the race of a prospective buyer of his home is not *per se* violative, where, under the circumstances the agent's answer is not couched in such a fashion as to prey upon the fears of the homeowner. To require the agent to stand mute in the face of such a question initiated by the homeowner would be to ignore the fact that the homeowner has traditionally expressed a justified interest in the person who proposes to purchase his home. Moreover, it does not appear that such a good faith response would serve to frustrate either the letter or the spirit of Section 3604(e) since that section ex-

plicitly requires that the representations must be made to *induce the sale* of the homeowner's property. Statements or acts of inducement, calculated by the agent to engender a sense of fear and urgency in the seller, would appear to be those statements that are made prior to a seller's own inquiries and that repeatedly emphasize and accent a prospective buyer's race. Thus, in United States v. Mintzes, 304 F.Supp. 1305, 1312 (D.Md.1969), Judge Thomsen stated that:

"Similar [Constitutional] problems would arise if the Act were applied to an honest answer to a question put by the owner of a dwelling. As we have seen, only one of the representations relied on by the plaintiff in this case was made in response to a question." (Citation omitted)

▆ In light of the above discussion, the Court at this threshold point cannot include, in determining whether defendant's collective conduct constitutes a pattern or practice, any statements about a buyer's race that resulted from inquiries made in the first instance by the homeowner and must likewise exclude any statements regarding the race of a prospective buyer where there exists a question whether the agent's statement was made in response to any inquiry. Having heard the testimony of the various former homeowners in East Knoxville, there appears to be substantial conflict in this regard in the statements made by a Saroff agent to Mr. Baker, Mr. Coffey, Mr. Qualls, Mrs. Hood and Mrs. Dunsmore. Thus, unlike the case before the Court in *Mintzes*, more than one of the representations relied on by the plaintiff in this case was made in response to a question.

Remaining before the Court in determining whether defendant individually violated Section 3604(e) are the two or

---

12. "[T]he 'reasonable man' standard protects the salesman from the paranoid who interprets a real estate salesman's 'good morning' as a part of a sinister scheme to undermine the value of his house." 327 F.Supp. at 479.

13. Although alone not dispositive, the action instituted in *Brown* was brought by private citizens under 42 U.S.C. § 3612 as opposed to the Attorney General as is the case under examination here.

three statements made by a Saroff agent to a homeowner (Mrs. Gambrell, Mrs. Byrd, Mrs. Dunsmore).

■■ Having observed the witnesses in the presentation of their testimony, it is the opinion of the Court that the remaining statements attributed to Saroff agents were not made with the requisite intent under Section 3604(e), an intent to make the representations for the purpose of inducing a person to sell or rent a dwelling.[14] In concluding that the requisite intent was absent here, the Court looks to several controlling factors:

1. The number of times references to race were reiterated during the course of an agent's contact with a homeowner.

2. The number of times the agent returned to a homeowner without any invitation having been previously extended.

3. Whether the statement was made accidently and as an isolated and singular instance or as an integral part of an overall scheme.

4. The overall tenor of the agent's conversation with the homeowner.

Again, the Court must emphasize that an agent's isolated statement should not prove itself *per se* violative of the Act since it does not seek to prohibit the isolated, unusual, and unintentional occurrence. An adjudication of an individual's conduct under the Act does not lend itself to a litmus test.

■ However, assuming, *arguendo*, that the remaining statements were made with the requisite intent as a part of a deliberate plan, the question arises whether the acts of Mrs. Williams and Kelley in violation of Section 3604(e) can be attributed to Mr. Saroff under the doctrine of respondeat superior since it was neither alleged nor proved by the Government that Mr. Saroff himself made any intentional representations. " . . . The court is fully aware that under the doctrine of respondeat superior a master is chargeable with the acts of his servant committed within the scope of his authority, but the court is also strongly of the opinion that this statute requires, if not an intentional act by the principal, at least a consciousness that the act is going on or a showing of acquiescence or conscious indifference. Certainly if a salesman's violation comes to the principal's attention and he takes no steps to redress the violation and to insure that it does not happen again, he may be said to be engaging in a 'pattern or practice' within the meaning of this Act, but a principal should not be visited with a sweeping and harassing injunction if it appears that he had forbidden the practice, knew nothing of its existence in spite of vigilance, and took prompt steps to correct it once it was discovered.

"But again, this is not the situation here. In the first place there is at least some evidence that door-to-door solicitation was normally used by the defendant's salesmen in areas of transition and that this was known to defendant. There is also the affidavit of Mrs. Walker which states, among other things, that defendant's saleswoman, Mrs. Rick, told the affiant that the defendant had told his sales personnel to 'work an area' once the first Negro family moved in. This is not to say, of course, that real estate agents cannot 'work' transitional areas if they obey the law. . ."

327 F.Supp. at 485.

Unlike the situation before the Court in Mitchell, the record in this instance indicates that Mr. Saroff neither encouraged "working" a neighborhood when the first Black family moved in nor did he urge his agents to solicit listings on a door-to-door basis. Further, there is nothing to indicate that Mr. Saroff was ever apprised of wrongful conduct on the part of his agents or that he ever received any complaints from either homeowners or buyers. In this regard, it is significant to note that the

14. 304 F.Supp. at 1311.

Knoxville Housing Authority, the local agency charged with the responsibility of supervising the relocation program, never addressed a specific complaint to Mr. Saroff about his East Knoxville transactions. Instead, Mr. Ulmer, who testified that he worked closely with Saroff during the relocation program, stated that Saroff cooperated with his agency after the June 17 meeting and that Saroff did a good job in getting buyers and sellers together. As this agency had an opportunity to observe the day-to-day professional activities of Saroff and was instrumental in relocating displacees, the testimony of Mr. Ulmer must receive considerable weight.

Plaintiff contends that the blockbusting evidence here involves substantially more specific incidents than that held sufficient in the *Mitchell, Bob Lawrence* and *Mintzes* cases. The Court has carefully examined the representations and conduct of the agents in those cases, together with conduct and representations made in Sanborn v. Wagner [15] and Brown v. State Realty Co.[16] and concludes that in each instance the agents' conduct was relatively more reprehensible and harmful than that evidenced here by Saroff's agents. In each instance the agent was more tenacious and insistent in his representations. Also distinguishing is the fact that in those cases the agent went beyond the initial statement that a prospective buyer was Black and emphasized the injurious impact a Black influx would have on his own home and neighborhood. For example, the agent would often urge the homeowner to sell promptly since if he waited he "would not get what the house was worth," [17] or "if [the property owners] wanted to get a good price for their home they should sell now," [18] that a neighborhood would be occupied in the future by an "undesirable element," [19] which made the neighborhood unsafe,[20] or that "the neighborhood is getting black and would be unsafe to live . . . ." [21] Clearly, in those instances cited by plaintiff the agent's statements extended beyond an informative remark and, instead, were made out of a hope of preying upon the homeowner's fears and prejudices.

*Pattern or Practice*

Although the foregoing summary of the evidence and applicable law discloses that Saroff's actions were not in violation of Section 3604(e), a cautious examination of this case requires the Court to determine whether Saroff's statements made before an inquiry by a homeowner constitute a pattern or practice under Section 3613, assuming, *arguendo*, that the statements satisfied the requirements of Section 3604(e).

It is generally settled that an injunction for a violation of Section 3604(e) cannot issue as a result of an isolated incident. Instead, the representations of the defendant must be shown to have been repeated, routine and regularly engaged in as a course of business.[22] Traditionally, the courts have looked to United States v. Mayton, 335 F.2d 153 (5th Cir. 1964), for the standard to be used when determining whether a defendant's collective conduct constitutes a pattern or practice. There, in finding a denial of voting rights under the Civil Rights Act of 1960, the Fifth Circuit submitted:

"The words *pattern or practice* were not intended to be words of art. No magic phrase need be said to set

15. 354 F.Supp. 291 (D.Md.1973) (private action).

16. 304 F.Supp. 1236 (N.D.Ga.1969) (private action).

17. United States v. Mitchell, 327 F.Supp. 476, 478 (N.D.Ga.1973) (denying motion for summary judgment).

18. Id.

19. United States v. Mintzes, 304 F.Supp. 1305, 1310 (D.Md.1969).

20. Id. at 1311.

21. Sanborn v. Wagner, 354 F.Supp. 291, 293 (D.Md.1973).

22. See generally 13 A.L.R.Fed. 269, 294.

in train the remedy provided in § 1971(e). Congress so understood them. And the legislative history reflects the adoption of the approach epitomized by Deputy Attorney General Walsh before the House Judiciary Committee:

" Pattern or practice have their generic meanings. In other words, the court finds that the discrimination was not an isolated or accidental or peculiar event; that it was an event which happened in the regular procedures followed by the state officials concerned.' " (Emphasis in text)

335 F.2d at 158.

The district court in *Mintzes* adopted the *Mayton* construction but emphasized that the number of incidents necessary to establish a pattern or practice depends upon the nature of the right protected and the nature of the violations:

"The evidence before the Court indicates a disposition on the part of the defendants to use racial representations in circumstances where it appears that such representations may be effective in inducing the owner to sell."

304 F.Supp. at 1314.

Thus, as stated in *Mitchell*, the racial representation must not only be made in the course of the defendant's business,[23] but, further, the representation must be repeated, intentional, deliberate, and usual. In this same vein, the holding of the district court in United States v. Bob Lawrence Realty, supra, is especially significant.

" . . . On the basis of these facts, this court cannot conclude that the government has alleged facts which show a definite inclination on the part of Bob Lawrence Realty to make prohibited representations. Though most of Lawrence's real estate activity has always been in areas that are now transitional, the government has alleged only three blockbusting representations. These violations were committed by two agents, working together. The representations were made on the same afternoon; there is no indication they were repeated by Agents Hammond or Murrison, or any other agents of Bob Lawrence. When compared with Bob Lawrence Realty's total activity in the area, the three representations relied on by the government appear to be isolated incidents. The court concludes that no § 3613 pattern or practice has been established on the part of Defendant Bob Lawrence, acting individually . . . ."

327 F.Supp. at 490.

■ Similarly, Saroff's real estate activity has been actively concentrated in the East Knoxville area under examination here long before the urban renewal relocation project began in June 1971. In fact, one of Saroff's offices is located in the area. He did not abruptly shift his operation from outside the transitional area upon learning of the relocation project. Also, like *Bob Lawrence*, the representations were made by two agents and there is no indication that such representations were made by other Saroff agents. Finally, when compared with Saroff's total East Knoxville business, the representations appear to be isolated instances. Viewed in this manner, it does not appear that the representations here constitute a pattern or practice under Section 3613.

### Group Pattern or Practice

The Government contends also that Saroff violated the Act as a result of his participation in a "group" pattern and practice of blockbusting and that even if Saroff did not violate Section 3604(e) as an individual, his participation in the group should be enjoined. In support of its contention that a group pattern existed the Government introduced the testimony of Mrs. McAmis, Mrs. Jordan and Mr. King that agents from Simco made unlawful representations to them, in addition to the testimony of Mr. Ogle

23. 327 F.Supp. at 483.

regarding a Jim Miller agent and the testimony of Mrs. Bea Tapley, a former M & W agent, that he had previously engaged in door-to-door solicitation and that he encouraged homeowners to sell because of the influx of urban renewal displacees.

The Government cites the Fifth Circuit's recent case of United States v. Bob Lawrence, 474 F.2d 115, 124 (5th Cir. 1973), for the proposition that the Court can enjoin Saroff for participating in group conduct which is allegedly in violation of the Act. In that case, the district court enjoined the defendants collectively as a group from their continued pattern or practice of violating Section 3604(e). It should be noted, however, that in *Bob Lawrence* each member of the group was a defendant in the action and was present at trial to protect his interest. In the present case, one member of the group was never a defendant and the remaining two members had previously executed consent orders.

 It is not enough, under the Act, that the Government identify the members of a purported group and attribute certain statements to their agents, since such a measure of violation would provide the Attorney General a potentially indiscriminate standard. Instead, as articulated by the district court in *Bob Lawrence*, a minimal nexus must be shown to exist among the members constituting the group:

" . . . The pattern or practice must be one on the part of the group acting as a unit. This would require, at the very least, a showing of *some coordination of effort on the part of the defendants*. Any less standard would provide the Attorney General with enforcement powers over the isolated acts of individual defendants acting independently of each other, merely because these persons' acts coincide in time or place with the acts of other violators . . . " (Emphasis added)

327 F.Supp. at 493.

Accordingly, while the group's members need not conspire to act in concert, the Act does require a minimal degree of coordination. Absent from the Government's proof, therefore, are two necessary elements: (1) A sufficient unity and coordination of effort among the members of the group, and (2) a sufficient unity and coordination of effort between the group and Saroff. This is not to say that a finding of individual violation under the Act must precede a finding of a group pattern or practice but only that a requisite degree of unity and coordination of effort must be found to exist. This requirement would not unduly burden the Government in its efforts to obtain compliance. Even if the Government could find unlawful conduct on the part of Saroff through "guilt by association" there exists no evidence of association between the group and Saroff.

### Steering

 The Government charges that Saroff accompanied his blockbusting activities with steering, in violation of Sections 3604(a), (b), (d) by directing prospective Black homebuyers away from White neighborhoods in West Knoxville and toward the transitional sector of East Knoxville. In view of the evidence heretofore summarized and the applicable law, it is the opinion of the Court that the Government has failed to prove by a preponderance of evidence that Saroff has engaged in a pattern or practice in violation of Section 3604(a), (b) or (d). United States v. Hunter, 459 F.2d 205 (4th Cir. 1972); United States v. West Peachtree Tenth Corp., 437 F.2d 221 (5th Cir. 1971); Zuch v. Hussey, 366 F.Supp. 553 (E.D.Mich. 1973).

In support of its steering contention, the Government introduced (1) the selectively euphemistic use of "Fair Housing Broker" on an East Knoxville listing with no comparable use of the slogan on a West Knoxville listing in the same newspaper; (Exhibit 22) (2) the testimony of Mrs. Dunsmore that Mrs.

Kelley stated to her that she was showing homes in the area to "colored people" only; (3) the testimony of Caroline Davis and Wilma Dunaway that Mr. Levitt of Saroff failed to advise Mrs. Davis of a West Knoxville listing; (4) the testimony of Mr. Beard that an unidentified Saroff agent told him over the phone that he would not feel comfortable living in the East Knoxville neighborhood of Holston Heights, and instead, referred him to West Knoxville and (5) the testimony of Mrs. Glen that when she was shown a home in Holston Hills, a Saroff agent stated that Blacks were still "east of Sunset." The Government contends that collectively this evidence shows a predisposition on the part of Saroff to steer Blacks into and Whites away from the transitional neighborhood, ultimately resulting in the resegregation of East Knoxville.

The countervailing factors to this testimony are: (1) that, traditionally, defendant's principal operation was centered in East Knoxville and (2) a reflection in the record that certain prospective Black buyers were shown homes throughout Knoxville, including the West area, by Saroff agents.

More specifically, the Court cannot find that the Davis-Dunaway incident was the result of racial steering in light of the nature of the available Saroff listings in West Knoxville at the time in question, in particular, the house on Tranquilla Lane. Likewise, the Court cannot conclude that the statement made to Mr. Beard in 1969 that he would not be comfortable in East Knoxville was premised upon a desire to steer White persons away from East Knoxville since such a statement could be based upon several legitimate variables—variables that are difficult to determine at trial in 1974. We recognize that the format of Exhibit 22 can be construed to indicate that the East Knoxville listing was projected at a Black market and the West Knoxville listing, in comparison, to a White market, but feel that one ad, which is subject to more than one interpretation, is not indicative of a pattern or practice by Saroff.[24]

Finally, the Government submits that Saroff steered Blacks into the transitional neighborhood of East Knoxville by including only East Knoxville locations in listings that were sent to the Housing Authority for relocation of displacees. (Exhibit 15—amended) It would appear, however, that Saroff's traditional East Knoxville focus and the express desire of the displacees to remain in that area necessitated this tendency. Moreover, the Housing Authority never urged Saroff to submit listings from any other areas.

■ There remains the Government's alternative contention that it should prevail on the theory that defendant denied rights to a group of persons and such denial raises an issue of general public importance, even in the absence of a pattern or practice. United States v. Hunter, 459 F.2d 205, 218 n. 17 (4th Cir. 1972). In light of the above discussion, the Court concludes that the Government cannot prevail under this theory since the proof fails to show that the citizens of this community were denied any right cognizable under the Act.

In conclusion, it is significant to note that the proof showed that defendant was investigated by the Federal Bureau of Investigation over a period of months; however, no representative from that agency testified at the trial nor was any of the data accumulated by it introduced into the record. The Court can only speculate whether information from that organization would have thrown light on some of the issues involved in this case.

Having examined the testimony introduced at trial together with the accompanying exhibits, the Court finds that plaintiff has failed to establish by a pre-

---

24. Exhibit 16 evidences pre-Act discriminatory advertising by Saroff and is admissible for this limited purpose. United States v. West Peachtree Tenth Corp., 437 F.2d 221, 227 (5th Cir. 1971).

ponderance of evidence that Saroff, either as an individual or as a member of a group, engaged in a pattern or practice of conduct in violation of the Fair Housing Act.

Accordingly, it is Ordered that plaintiff's action be, and the same hereby is, dismissed.