791 F.2d 394
 40 Fair Empl.Prac.Cas. 1729,
40 Empl. Prac. Dec. P 36,230
John H. RATLIFF, James V. Williams, Jr., and Linda E.
Johnson, Plaintiffs- Appellants,
v.
GOVERNOR'S HIGHWAY SAFETY PROGRAM; William F. Winter,
Governor of Mississippi; Roy Thigpen, Director, Governor's
Highway Safety Program; Chester H. Ballock and W.D. McCain,
Former Directors of the Governor's Highway Safety Program,
Defendants-Appellees.
 No. 84-4772.
 United States Court of Appeals,
Fifth Circuit.
 June 11, 1986.
 
 Joe Katcoff, New York City, Nausead Stewart, Lawyers' Comm. for Civil Rights Under Law, Jackson, Miss., for plaintiffs-appellants.
 Sidney Jerald Martin, Asst. Atty. Gen., Edwin Pittman, Atty. Gen., William S. Boyd, III, Sp. Asst. Atty. Gen., Sara E. DeLoach, Asst. Atty. Gen., Jackson, Miss., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before GEE, RUBIN, and DAVIS, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 In this Title VII action, two applicants for employment with, and one former employee of, the Governor's Highway Safety Program, an agency of the State of Mississippi, allege that they were subjected to race and sex discrimination. Two black males contend that the Agency failed to hire them because of their race and a black female, discharged by the Agency, contends that she was harassed and not promoted while an employee and was then discharged because of her race and sex in retaliation for her having filed discrimination charges against the Agency. One of the black males also contends that the Agency retaliated against him for filing a discrimination charge with the Equal Employment Opportunity Commission. The parties consented to a trial before a magistrate who rendered judgment for the defendants. His findings of fact, however, lack the specificity required by Rule 52(a) of the Federal Rules of Civil Procedure and do not permit effective appellate review. We, therefore, vacate the judgment and remand for further proceedings.
 
 I.
 
 2
 The Mississippi Governor's Highway Safety Program (the Agency) is funded by the federal National Highway Traffic Safety Administration pursuant to the Highway Safety Act of 1966.[1] The racial and sexual composition of the Agency's workforce from its inception in 1968 through 1984 is set out in the following chart:
 
 
 3
 As can readily be seen, through 1976 the Agency had only one black employee, Roy Thigpen, who, by the time of trial, had become Director of the Agency. In 1977, when the Agency had a total of 24 white employees, a second black male was hired.
 
 
 4
 During the years in which the events complained of in this suit arose, 1978 and 1979, state law forbade the Agency to solicit or accept employment applications directly from the public. The state merit employment law required employment applications to be submitted to the Mississippi Classification Commission, the predecessor of today's Mississippi State Personnel Board. The Commission administered tests and evaluated applicants' education and work experience to determine those qualified for various state jobs. It maintained a register of eligibles that listed the names of individuals who had sought state employment and were qualified.
 
 
 5
 A state agency could fill a vacant position in two ways: (1) from within, by requesting the Classification Commission to evaluate a current employee's qualifications and determine if he or she met the minimum requirements for the position in question (referred to as an agency-only noncompetitive position), or (2) from without, by requesting a certificate of eligibles from the Classification Commission. Such a certificate would rank the individuals who had applied and were qualified for the job. The requesting agency was required to hire from the ten highest ranked applicants listed on the certificate of eligibles, or from all those with the same whole score as the tenth name on the certificate. Mississippi state agencies were also permitted to hire temporary employees on an "emergency" basis without following these procedures. These "emergency" appointments were on a time-limited basis and without any job tenure.
 
 A. John A. Ratliff
 
 6
 Ratliff applied to the Classification Commission in November 1977 for the position of field representative with the Agency. At that time the Agency employed several field representatives, each of whom was assigned to an area of the state comprising several counties. On his application, Ratliff indicated that he preferred to work in the Jackson area. There was never any question about his qualifications, and the Agency eventually ranked him as one of the best qualified applicants. On July 3, 1978, while Ratliff's application was pending, the Agency hired as temporary, emergency employees two white male field representatives, Gene Sanders and Donny Ray Barber, although neither had been evaluated by the Commission. The Governor had summoned the Agency director to his office and told the Director that he knew Sanders personally and wanted to see if Sanders could be hired on an emergency basis. The Governor also told the Director to have Sanders apply for a permanent position and see that it was filled as rapidly as possible.
 
 
 7
 When he learned that the Agency had hired Sanders and Barber, neither of whom had the college degree that he had attained, Ratliff filed a charge of discrimination with the Equal Employment Opportunity Commission on July 12. At about this time, the Classification Commission refused to ratify the employment of the two whites because they had not been certified.
 
 
 8
 In July and August 1978, the Agency had vacancies for field representatives in four different areas of the state. To fill them it requested the Classification Commission to issue four certificates of eligibles, each on a "local" certificate. A local certificate lists applicants who have specified a preference to work in a particular part of the state. Because it reimbursed field representatives for their duty-related mileage, the Agency used local certificates to ensure that the pool of job applicants consisted of persons willing to live in the area where they would be working.
 
 
 9
 The Classification Commission issued its first certificate, which listed those applicants who had indicated a desire to work in the Jackson area, on July 19. Ratliff's name appeared on the list and he was interviewed. The Agency's records reflect that the interview went well. During his interview, Ratliff stated that, although he would not move his family from Jackson, he was willing to accept employment in any part of the state if he could live there during the week, returning to Jackson only on the weekends. The Agency, however, did not hire anyone listed on that certificate, but requested the Commission to issue another local certificate for the Jackson-area position.
 
 
 10
 The Classification Commission then reissued a certificate for the Jackson field representative position and issued certificates for the three other vacancies as well on July 31. The only person hired from any of these certificates was Gene Sanders, the white male who had previously been appointed on an "emergency" basis. The Agency then cancelled the remaining certificates, leaving three positions, including the opening in Jackson, unfilled.
 
 
 11
 The Agency offered testimony that the local certificates had listed so many qualified applicants that it would have been inordinately time-consuming for its top officers to conduct the customary interview with each applicant. To reduce the burden of interviewing, the director of the Agency decided to cancel the three local certificates and have the Classification Commission issue one "statewide" certificate. A statewide certificate lists only those applicants who have indicated a willingness to live in any part of the state.
 
 
 12
 A certificate containing the names of ten persons who were willing to accept employment statewide was issued on August 18. Three of the persons listed were ultimately selected: two black males, Billy Terrell and Benny Frank Paige, and one white male, Michael Hydrick. The selection was made, however, after the EEOC had begun investigating Ratliff's complaint and one week after the director of the Agency wrote a memorandum to the state Attorney General denying Ratliff's charge. The Agency had never before hired a black field representative.
 
 
 13
 Terrell was assigned to the Natchez area but did not relocate his family. So far as the record discloses, the Agency found this acceptable. Paige moved to the area to which he was assigned, which was Jackson, the place where Ratliff lived and where he had wished to work. Hydrick, the white male, did not accept the job. No other field representatives were ever hired and the position was later abolished.
 
 
 14
 Ratliff filed a second charge with the EEOC alleging that he had been discriminated against not only because of his race, but also in retaliation for having filed his first EEOC complaint. The EEOC issued an investigation report, which was received in evidence at the trial. The report concluded that the Agency had not adhered to a policy of requiring field representatives to live in the area to which they were assigned. Accordingly, it found that the only distinguishing factor between Ratliff and those applicants who were hired was that Ratliff had filed a discrimination charge against the Agency.
 
 
 15
 Without discussing any of the evidence or the claim of retaliation, the magistrate found that Ratliff and Williams, another plaintiff whose claim is addressed below, "made a prima facie case ... but the defendant has articulated a legitimate non-discriminatory reason for its failure to hire them, that is, the location of the assignments." Inter alia, this takes no account of the fact that Paige was hired to work in Jackson, the location Ratliff desired, and Terrell was hired to work in an area where he did not live, as Ratliff said he was willing to do. The magistrate added that "there has been no adequate showing by the two plaintiffs that this reason was pretextural [sic], especially since two of the three positions were filled by blacks, and the third position was in an area not within commuting distance of Hinds County."
 
 
 16
 B. James V. Williams, Jr.
 
 
 17
 Williams applied for a field representative job on July 12, 1978, specifying a preference to work in Jackson. He was listed on the second local certificate that the Classification Commission issued for the Jackson-area vacancy. As noted above, Sanders was the only person hired from any of the local certificates. Williams was never interviewed and the local certificate listing him was one of those cancelled when the statewide certificate was sought. The Agency contends that Williams was not listed on the statewide certificate because Williams had not indicated statewide availability on his application.
 
 C. Linda E. Johnson
 
 18
 Johnson was hired as a secretary on July 1, 1978. She was the only black female then employed by the Agency. To illustrate the atmosphere in which she worked, she introduced evidence that the Agency separated its staff by race. Thigpen, who was then an administrative assistant, stated in an affidavit filed in connection with an EEOC investigation and acknowledged by him at the trial that, in February 1979, Ms. Charlotte Callen, the Agency's deputy director, asked him to take Ms. Johnson as his secretary in exchange for a white female secretary who had been assigned to him. Thigpen agreed to the swap although this appeared to him to be an attempt to separate the staff by race.
 
 
 19
 Johnson contends that later in 1979 the Agency created two new positions with the classification Assistant Planner and offered the positions to two male employees, one white and one black. The job openings were not posted and other employees were not advised that the positions existed. Johnson learned of the positions only after they had been filled. The Agency maintains that these were not new positions but were merely assignments of additional duties to the two men, without additional pay or change of job title. Some of the Agency's correspondence, however, characterized the males' appointment as promotions.
 
 
 20
 Upon learning of the assignments, Johnson protested to the Agency director that she should have received a promotion to Assistant Planner and complained that she had been denied it because of her sex. In March 1979 she filed a charge of discrimination with the EEOC. The EEOC ultimately found that Johnson was qualified for the position of Assistant Planner while at least one of the men was not, and that the Agency had violated the state merit promotion policy in promoting the males.
 
 
 21
 Johnson asserts that she began to be harassed after she filed her complaint. As an example she testified about an episode in which she resisted an instruction from Allen Torrance, a white male superior to her, on the basis that he was discriminating against her in favor of white secretaries. Torrance sent a memorandum to the Deputy Director complaining of Johnson's "insubordination." Thigpen, to whom Johnson was then assigned as secretary, responded to the memo expressing dismay at this attempt "to harass Miss Johnson as has been done in the past." Thigpen stated in the affidavit that there seemed to have been an organized effort by white female Agency employees, including the Deputy Director, to harass Johnson "so as to get her to resign." He also related that Torrance told Thigpen that he, Torrance, would do whatever he could or use any influence he had to get Johnson terminated. Despite this incident, the Deputy Director promptly thereafter assigned Johnson to work for Torrance.
 
 
 22
 Johnson also alleges that, after she complained of discrimination, the Agency audited her use of the WATS telephone line and asked her to reimburse the Agency for personal calls when other employees, who also made personal calls on the line, were not asked for reimbursement.
 
 
 23
 In May 1979 the federal government notified the Agency that its funds would be cut off at the end of the month. The Governor appointed William McCain as Acting Director of the Agency and instructed him to do whatever was necessary to get federal financing restored. The Atlanta NHTSA office, which controlled the federal funds, ordered McCain to reduce the Agency staff from 20 to 16 persons. McCain discharged two white males, one black male, and Johnson. He testified that he selected Johnson because Thigpen no longer needed a secretary, a fact confirmed by Thigpen at trial, that he personally made the decision, and that he was not influenced by her race or sex. McCain did not explain why he selected Johnson, who was classified as a Secretary 4, rather than a white female clerical employee, who was classified as a Clerical 3 and who had less seniority than Johnson.
 
 
 24
 The Agency contends that the duties of the clerical employee were different from Johnson's. Their job descriptions were indeed different, as were their classifications, but Johnson testified that she sometimes substituted for the clerical worker and that she could do her job. The record contains no evidence about the relative pay of the two positions, and no testimony about the actual requirements of the two jobs or their relative rank. In any event, Johnson was not offered the clerical position as an alternative to termination.
 
 
 25
 In June 1980, Johnson was offered reinstatement to her secretarial job but declined it. She testified that she had accepted another job, and would not return to work for the Agency as a secretary, but would accept reemployment in one of the other jobs she had applied for.
 
 
 26
 The magistrate made no finding concerning whether the appointment of the male employees as Assistant Planners constituted the filling of a vacancy or whether their designation was a promotion. He simply found that Johnson had never applied for the post of Assistant Planner and thereby failed to make a prima facie case of sex discrimination. Nor did the magistrate find whether the selection of Johnson for discharge rather than the less senior clerical employee was discriminatory. He concluded that Johnson had made a prima facie case of discriminatory discharge, but that the Agency had articulated a legitimate non-discriminatory reason for her termination, which he did not specify and which she had failed to prove to be a pretext for discrimination.
 
 II.
 
 27
 The perfunctory and conclusory findings of the magistrate do not comport with the requirement of Federal Rule of Civil Procedure 52(a), which provides that a trial court "shall find the facts specially." The rule has several purposes. The necessity of making findings "engender[s] care on the part of the trial judge in ascertaining the facts."[2] Such findings also make definite what was decided for purposes of res judicata and collateral estoppel.[3] Finally, while the rule exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness, the findings must be explicit enough to enable us to review them.[4]
 
 
 28
 In an employment discrimination case, a plaintiff may prevail either by persuading the court that a discriminatory reason more likely motivated the employer or by showing that the employer's proffered explanation is not worthy of credence.[5] The ultimate issue, however, and the one to be decided by the court, is whether the employer intentionally discriminated against the plaintiff.[6] If the trial court believes the employer's explanation of its motivation, the court may not merely state, in conclusory terms, that the plaintiff has failed to prove the employer's suggested reason to be a pretext for invidious discrimination[7] or that there is no evidence of discriminatory treatment.[8] It must at least refer to the evidence tending to prove and disprove the merits of the proffered explanation and state why the court reached the conclusion that the explanation has not been discredited. We have, therefore, routinely reversed a trial court that has failed to set forth sufficient findings of fact and conclusions of law in actions under Title VII.[9] Once again, we repeat the admonition given in Redditt v. Mississippi Extended Care Center,[10]
 
 
 29
 In reviewing the district court's finding of no discrimination under the clearly erroneous standard, this Court cannot be left to second guess the factual basis for the district court's conclusion. This Court cannot determine whether the district court's finding that plaintiff failed to demonstrate pretext was clearly erroneous when the district court's finding is not expressed with sufficient particularity. It is not the function of this Court to make credibility choices and findings of fact. We are therefore left with no choice but to vacate the judgment of the district court for failure to comply with Fed.R.Civ.P. 52(a) and remand for findings of fact which indicate the factual basis for the district court's conclusion on the issue of pretext.
 
 
 30
 The magistrate's findings, which we set forth in full in the footnote,[11] are simply inadequate to meet the requirements of the rule. He failed to make any findings with respect to the alleged harassment of Linda Johnson prior to her discharge. His discussion of Johnson's discharge omits any reference to the central issue: why the Agency chose to conserve funds by discharging Johnson rather than the less-senior white employee. With respect to Ratliff, he did not discuss the fact that Ratliff, who had expressed his willingness to accept a temporary position, was passed over when temporary emergency appointments were made, why the hiring of a black employee other than Ratliff disproves Ratliff's charge of retaliation, why the refusal to hire Ratliff because he would not move his family was justified when one other employee was hired and not forced to move and yet another was hired and required to move to Jackson. He did not comment on the fact that the "statewide" requirement was never mentioned by the Agency until after Ratliff had filed the EEOC charge. Having received the voluminous EEOC report on all three persons, he did not mention why he disregarded its findings.
 
 
 31
 The magistrate's opinion is also marred by several misapplications of law. The court reasoned that the Agency's hiring of two black field representatives precluded a conclusion that the Agency's location-of-assignment justification was a pretext. However, the mere hiring of a black after alleged discrimination against another may, as the Eleventh Circuit said in Howard v. Roadway Express, Inc.,[12] itself be "a pretextual device specifically designed to disguise an act of discrimination." Such hiring after a charge has been filed may be merely a post-hoc effort to disprove the charge.[13] The district court also improperly concluded that a nonapplicant, such as Johnson, is ipso facto barred from recovering under Title VII. The Supreme Court has noted that "[v]ictims of gross and pervasive discrimination could be denied relief precisely because the unlawful practices had been so successful as totally to deter job applications from members of minority groups."[14] We have recognized that nonapplicants can recover under Title VII.[15]
 
 
 32
 The magistrate's opinion is further weakened by his limitation of indirect evidence of discriminatory intent to show the "atmosphere" in which the plaintiffs "operated." An employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination.[16]
 
 
 33
 Because of these errors of law and the insufficiency of the factual findings, the judgment is VACATED and the case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 Codified as amended at 23 U.S.C.A. Secs. 401-408 (West Supp.1986)
 BLACK BLACK WHITE WHITE
 YEAR MALES FEMALES MALES FEMALES
-------------- ----- ------- ----- -------
 1968 13 2
 1969 1 21 7
 1970 1 16 8
 1971 1 12 8
 1972 1 16 4
 1973 1 16 5
 1974 1 16 5
 1975 1 15 5
 1976 1 14 6
 1977 2 17 7
1978 (to Oct.) 2 1 13 6
 1978 (after
 Oct.) 4 1 13 6
 1979 4 1 10 7
 1980 5 3 2 4
 1981 3 2 2 3
 1982 3 1 2 2
 1983 3 1 2 2
 1984 3 1 2 2
 
 
 [2]
 Golf City, Inc. v. Wilson Sporting Goods Co., 555 F.2d 426, 432 (5th Cir.1977)
 
 
 [3]
 C. Wright, Law of Federal Courts 646 (4th ed. 1983)
 
 
 [4]
 Echols v. Sullivan, 521 F.2d 206, 207 (5th Cir.1975); Nickerson v. Travelers Insurance Co., 437 F.2d 113, 114 (5th Cir.1971); C. Wright, supra note 3, at 646. See generally C. Wright & A. Miller, 9 Federal Practice and Procedure Sec. 2571, at 679 (1971)
 
 
 [5]
 Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207, 217 (1980)
 
 
 [6]
 United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403, 410 (1983); McDaniel v. Temple Independent School District, 770 F.2d 1340, 1347 (5th Cir.1985); Elliott v. Group Medical & Surgical Serv., 714 F.2d 556, 564 (5th Cir.1983), cert. denied, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984)
 
 
 [7]
 Sylvester v. Callon Energy Services, Inc., 724 F.2d 1210, 1213-16 (5th Cir.1984); Redditt v. Mississippi Extended Care Centers, Inc., 718 F.2d 1381, 1386 (5th Cir.1983); Wheeler v. City of Columbus, 686 F.2d 1144 (5th Cir.1982); see also Marable v. H. Walker & Associates, 644 F.2d 390, 396-97 (5th Cir.1981)
 
 
 [8]
 Simon v. Honeywell, Inc., 642 F.2d 754, 756 (5th Cir.1981)
 
 
 [9]
 Sylvester v. Callon Energy Services, Inc., 724 F.2d 1210 (5th Cir.1984); Redditt v. Mississippi Extended Care Centers, Inc., 718 F.2d 1381 (5th Cir.1983); Wheeler v. City of Columbus, Miss., 686 F.2d 1144 (5th Cir.1982); De Anda v. St. Joseph Hospital, 671 F.2d 850 (5th Cir.1982); Simon v. Honeywell, Inc., 642 F.2d 754 (5th Cir.1981); Jefferies v. Harris County Community Action Ass'n., 615 F.2d 1025 (5th Cir.1980); Parson v. Kaiser Aluminum & Chemical Corp., 575 F.2d 1374 (5th Cir.1978), cert. denied, 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979); Corley v. Jackson Police Dep't, 566 F.2d 994 (5th Cir.1978)
 
 
 [10]
 718 F.2d 1381, 1386 (5th Cir.1983)
 
 
 [11]
 The magistrate's opinion reads as follows:
 Ratliff and Williams made a prima facie case as to the Field Representative position, but the defendant has articulated a legitimate non-discriminatory reason for its failure to hire them, that is, the location of the assignments. In the opinion of the Court, there has been no adequate showing by the two plaintiffs that this reason was pretextural [sic], especially since two of the three positions were filled by blacks, and the third position was in an area not within commuting distances of Hinds County.
 There is likewise no merit to the claim of Plaintiff Johnson that she was not promoted to the position of Assistant Planner. She never applied for the position, and thereby failed to make a prima facie case.
 More difficult to assess was the claim of Johnson that she was terminated as a part of the reduction in force mandated by Atlanta. Although Johnson was the only person in the Secretary IV classification, one white clerical employee with less seniority than Johnson, Jannel Furr, was retained. Furr was employed as a Clerk Typist III, not in the same classification as plaintiff Johnson.
 W.D. McCain, Director at the time of Johnson's termination, had been in the agency only 6 weeks before ... the reduction in force took place. He testified that he was appointed on an interim basis for the sole purpose of restoring Federal funding for the agency. He alone made the decision to terminate. That decision, he said, was not based on any complaints against her by agency personnel, but solely on the withdrawal of funding and "the fact that Roy Thigpen's functions had changed and he no longer needed a secretary." No one was hired in Johnson's position until June 1980, after she declined reinstatement.
 It is the opinion of the Court that Johnson has made a prima facie case of discrimination on the termination charge, but that the defendant has enunciated a legitimate non-discriminatory reason for her termination which has not been shown to be a pretext for discrimination.
 For the above and foregoing reasons, the Court finds for the Defendant and against the Plaintiffs on all claims.
 
 
 [12]
 726 F.2d 1529, 1535 (11th Cir.1984)
 
 
 [13]
 Id. See also Lee v. Conecuh County Bd. of Ed., 634 F.2d 959, 964 (5th Cir.1981)
 
 
 [14]
 Teamsters v. United States, 431 U.S. 324, 367, 97 S.Ct. 1843, 1871, 52 L.Ed.2d 396, 434 (1977)
 
 
 [15]
 Claiborne v. Illinois Cent. Gulf R.R., 583 F.2d 143, 150 (5th Cir.1978), cert. denied, 442 U.S. 934, 99 S.Ct. 2869, 61 L.Ed.2d 303 (1979). See also Box v. A & P Tea Co., 772 F.2d 1372, 1377 (7th Cir.1985); Rodgers v. Penninsular Steel Co., 542 F.Supp. 1215 (N.D.Ohio 1982)
 
 
 [16]
 Teamsters v. United States, 431 U.S. 324, 358, n. 44, 97 S.Ct. 1843, 1866, n. 44, 52 L.Ed.2d 396, 429, n. 44 (1977); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804-05, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668, 678-79 (1973)